# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-80870-CIV-ROSENBAUM/HUNT

MICHAEL A. HUDSON,

        Plaintiff,

v.

CITY OF RIVIERA BEACH, GLORIA
SHUTTLESWORTH, DORETHA PERRY,
and PAUL WHITE,

        Defendants.

_____/

## <u>ORDER ON MOTION TO DISMISS</u>

This matter is before the Court upon Defendants' Motion to Dismiss Plaintiff's Amended Complaint [D.E. 29]. The Court has considered the Motion, the parties' briefs, and the Amended Complaint and is otherwise fully advised in this matter. For the reasons explained below, the Court grants in part and denies in part Defendants' Motion to Dismiss. The Court further provides Plaintiff with an opportunity to amend his Amended Complaint.

### *I.  Factual Background*[1]

According to the allegations in Plaintiff Michael Hudson's Amended Complaint, City of Riviera Beach employee Defendant Doretha Perry used her position of power with the City to force Hudson, a City employee, to take a drug test for no reason other than a personal vendetta against

---

[1] The information contained in this section comes from Plaintiff's Amended Complaint in this action. On a motion to dismiss, the Court accepts the non-conclusory allegations as true and views them in the light most favorable to the plaintiff. *See, e.g.*, *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011).

him.  The vendetta allegedly arose out of Hudson's relationship with Troy Perry ("Troy"), the son of Defendant Doretha Perry ("Perry").

Hudson, who was a multi-media specialist for the City of Riviera Beach's government-access television station, had an argument with Troy shortly after Hudson began working for the City.  *Id.* at ¶¶ 1, 2, 16, 19.  The Amended Complaint contends that Troy, who was serving as the City's fire chief, tried to have Hudson reprimanded as a result of Hudson's disagreement with Troy, but he was unsuccessful.  *Id.* at ¶ 2.  As the Amended Complaint explains events, Troy's failure to have Hudson reprimanded exacerbated Troy's anger with Hudson and caused Troy to threaten, "[T]his is not over."  *Id.*

During a subsequent upheaval in the City, the City Manager was forced to resign, and Troy "was named and or given the duties of Interim Assistant City [Manager]."  *Id.* at ¶ 1.  In his interim position and true to his word, the Amended Complaint suggests, Troy apparently enlisted the assistance of his mother, Perry, to even the score with Hudson.  *See id.* at ¶¶ 1-3.

Perry, who was the Human Resources Director of the City at the time, arranged on February 3, 2009, for Hudson to be required to submit to three different types of drug tests.  *Id.* at ¶¶ 18, 28.  She did this, the Amended Complaint asserts, even though she was not Hudson's supervisor, Hudson's supervisor neither requested the drug test nor suspected Hudson of using drugs, Hudson had consistently received "excellent" evaluations and had never been reprimanded or disciplined in his four years of employment with the City, and Hudson did not work in a safety-sensitive position or perform safety-sensitive functions.  *Id.* at ¶¶ 2, 16, 19, 23.  Nor did Perry or anyone in her department work at the same location as Hudson.  *Id.* at ¶ 39.  To the contrary, Hudson alleges, they all worked at an office approximately three miles away from where Hudson worked, and Perry's

department had no interaction with Hudson.  *Id.*  As for Perry, she saw Hudson only at City Council meetings or on rare occasions when she and Hudson passed each other when Perry visited the City's main campus.  *Id.*

The Amended Complaint further avers that Hudson was advised that if he refused to take the drug tests, he would be fired.  *Id.* at ¶ 27.  When Hudson asked why he was being required to submit to drug testing, the City's risk manager responded that the test was based on "reasonable suspicion," although he did not know what the reasonable suspicion supporting the test was.  *Id.* at ¶¶ 21, 22.  According to the Amended Complaint, however, both the risk manager and Hudson's supervisor advised Hudson that they did not suspect Hudson of drug use.  *Id.* at ¶¶ 20, 23.  Nevertheless, the risk manager explained, Perry had required him to direct Hudson to submit to the tests.  *Id.* at ¶¶ 20, 23.

Therefore, on February 4, 2009, the Amended Complaint asserts, Hudson reluctantly took a Breathalyzer test, a urine test, and a hair-sample test.  *Id.* at ¶ 28.  After complying with the drug-test directive, Hudson asked Perry what the reasonable suspicion was for the testing and requested that Perry provide him with any records supporting reasonable suspicion.  *Id.* at ¶ 30.  The Amended Complaint claims that Perry became infuriated and retorted, "It does not work like that[.] [T]here are no records[.] I don't have to give you copies of anything."  *Id.*  When Hudson responded by showing Perry the Florida Drug Free Work Place Act, the Amended Complaint avers, Perry taunted, "[I]f I did break the law[,] what are you gonna do about it?"  *Id.*

Hudson left Perry's office and immediately notified then-Interim City Manager Gloria Shuttlesworth of his grievance regarding the drug testing.  *Id.* at ¶ 31.  Defendant Shuttlesworth stated that Perry should provide Hudson with copies of the documents that he had requested.  *Id.*

Armed with this information, Hudson returned to Perry's office and told her that Shuttlesworth had said that Perry should be able to provide copies of the records to Hudson.  *Id.* at ¶ 32.  According to the Amended Complaint, Perry responded that she had no records but told Hudson that if he returned with a records request, she would provide him with a report.  *Id.*

Hudson complied and presented the request to Perry within an hour.  *Id.*  But Perry did not provide the records at that time.  *Id.*  Instead, the Amended Complaint alleges, she angrily advised Hudson that she had twenty-four hours to respond to his records request and that she would respond within that time frame.  *Id*.

The next day, Perry provided Hudson with a one-paragraph explanation for why she ordered the drug testing.  *Id.* at ¶ 35.  The paragraph stated that Perry had "received several complaints from employees the latest on January 29th 2009, alleging [Hudson's] eyes were glassy and he smelled like marijuana."  *Id.* at ¶ 35.  It did not identify which employees had allegedly complained about Hudson, and Perry later stated that she could not recall who had complained and could not even remember the gender of the allegedly complaining person or persons.  *Id.* at ¶ 36.  Nor did Perry inform Hudson's immediate supervisor, Carrie E. Ward, that she had received complaints about Hudson.  *Id.* at ¶ 40.  During a subsequent unemployment-appeal hearing and deposition, the Amended Complaint avers, Perry contradicted her earlier explanation and instead stated that she had tested Hudson "on a whim[,] a mere hunch," and that she had been determining who to drug test in that manner "for years."  *Id.* at ¶ 37.

In the meantime, Hudson's urine test returned negative results.  *Id.* at ¶ 60.  On February 6, 2009, Hudson contacted Concentra, who had administered the drug testing, and advised the company of the circumstances surrounding Hudson's drug testing.  *Id.* at ¶ 59.  Concentra then informed

Hudson that he had a right to revoke the rights of the test under the Health Insurance Portability and Accountability Act, to the extent that the results had not yet been returned. *Id.* Upon learning this information, Hudson submitted a letter to Concentra revoking the rights to his protected health information until all administrative or legal matters were resolved. *Id.* Therefore, the results of the hair-sample test were not provided to the City.[2] *Id.* at ¶ 60.

On February 10, 2009, Hudson wrote a grievance letter to Defendant Shuttlesworth. *Id.* at ¶ 61. In that letter, Hudson asked Shuttlesworth to direct Perry to end all inquiries regarding the drug testing that Perry had ordered Hudson to undergo. *Id.* Shuttlesworth did not do so. *Id.* Instead, under what the Amended Complaint describes as a "new unapproved Clause" that Defendants and the City's attorneys created and added to the City's union agreement with its employees, Defendants suspended and then terminated Hudson's employment. *Id.* at ¶ 63.

As noted above, Hudson's employment was governed by a collective-bargaining agreement[3] entered into between the City and the Florida Public Service Union and the Service Employee International Union (the "Agreement"). D.E. 29-1. Article 29 of the Agreement outlines the City's

---

[2]The Amended Complaint does not reveal the results of the Breathalyzer test.

[3] As a general rule, courts may consider only matters within the four corners of the complaint in deciding a motion to dismiss. Where, however, the plaintiff "refers to certain documents in the complaint and those documents are central to the plaintiff's claim, the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6)." *Brooks v. Blue Cross & Blue Shield of Fla.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Certain portions of the collective-bargaining agreement were attached to Defendants' Motion to Dismiss. Because a large portion of Plaintiff's claims rests upon the City's failure to comply with the drug policy set forth in the collective-bargaining agreement, the Court has considered the attachment in resolving the Motion.

Drug-Free Workplace Policy, which was implemented pursuant to Fla. Stat. § 440.102.[4]  *Id.*  The policy states, in relevant part, that an employee may be drug tested when reasonable suspicion exists that an employee is using or has used drugs or alcohol.  *Id.*

In March 2009, Hudson was suspended from work.  *Id.* at ¶ 64.  The Amended Complaint avers that the City suspended him in retaliation for his refusal to release the results of his hair-sample test.  *Id.*  According to the Amended Complaint, the allegedly new clause that Defendants added to the City's union agreement specified  that a revocation of a drug test was tantamount to a refusal to take the test.  *Id.* at ¶ 63.  The City's drug policy provides that "any employee who refuses to submit to a drug test may be terminated from employment."  D.E. 27-1 at 75.  Hudson asserts that Defendant Paul White, the Assistant City Manager, was instrumental in drafting this new provision.  *Id.* at ¶ 66.

An administrative hearing took place in late April 2009 regarding whether Hudson should be terminated.  *Id.* at ¶ 73.  The Amended Complaint contends that the hearing was inadequate because Perry, Hudson's initial accuser, was not present, and Hudson was not given an opportunity to cross-examine any witnesses.  *Id.* at ¶¶ 74-75.  In addition, the Amended Complaint avers, Defendants did not provide Hudson with certain requested documentation until after the hearing had already occurred.  *Id.* at ¶ 80.  Moreover, Perry was permitted to make the recommendation as to Hudson's termination.  *Id.* at ¶ 83.  On May 15, 2009, the City terminated Hudson's employment.  *Id.* at ¶ 85.

Following his discharge, Hudson requested an appeal before the Civil Service Board.  *Id.* at ¶ 87.  At the time of Hudson's request, no Civil Service Board existed, and it took the City of Riviera

---

[4] In actuality, the agreement cites to Fla. Stat. § 440.201, but this section does not exist within the Florida Statutes.  Thus, the policy apparently  intended to refer to Fla. Stat. § 440.102, which details the Florida Drug-free workplace program requirements.

Beach more than six months to assemble one. *Id.* at ¶ 88. Hudson alleges that the City then allowed Perry to select the Board's hearing officer, who turned out to be a personal friend of hers. *Id.* at ¶ 89. In addition, the City did not make Defendants available for deposition until a year-and-a-half later. *Id.* at ¶ 90. Then, the Amended Complaint contends, the City ceased contact with Hudson. *Id.* at ¶ 91. It is not clear from the Amended Complaint what the outcome of Hudson's administrative appeal was. As a result of his termination, Hudson claims that he has been unable to reestablish his career in public television. *Id.* at ¶ 96.

## *II.  Procedural Background*

The eight-count Amended Complaint asserts seven constitutional claims and one state-law claim against the City of Rivera Beach and against Perry, Shuttlesworth, and White, both individually and in their official capacities. In Counts I through V and Count VII, Hudson asserts claims under 42 U.S.C. § 1983 that Defendants violated his civil rights under the Fourth and Fourteenth Amendments. Specifically, Plaintiff contends that the drug testing constituted an unlawful search and seizure and that Defendants violated his due-process rights in terminating his employment. Hudson also asserts that Defendant Shuttlesworth violated Hudson's First Amendment right to petition by retaliating against him for the letter he sent to the drug-testing facility (Count VI). Finally, in Count VIII, Plaintiff alleges that all Defendants violated the Florida Drug-Free Workplace Act because Defendants lacked the "reasonable suspicion" required under the City's drug policy to test him.

## *III.  Legal Standard*

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a complaint "does not need

detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). The Supreme Court has emphasized that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

When reviewing a motion to dismiss, a court must limit its consideration to the pleadings and exhibits attached to the pleadings and, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000). Upon engaging in this analysis, a court should deny a motion to dismiss where the pleading asserts non-conclusory, factual allegations, that, if true, would push the claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570) (quotation marks omitted); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570) (explaining that allegations in a complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"). A claim is facially plausible when the plaintiff's factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678.

### IV.  Discussion

### A.  Municipal Liability Under Section 1983

Defendants contend that the Amended Complaint should be dismissed as to the City of Riviera Beach (Counts I, II, and VIII) because the Amended Complaint does not state a claim for municipal liability.  Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, creates a cause of action against any person acting "under color of any statute, ordinance, regulation, custom, or usage of an State or Territory or the District of Columbia, [who] subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  To state a claim for relief under § 1983, a plaintiff must establish that (1) he has been deprived of a right, privilege, or immunity secured by the Constitution and (2) that he was so deprived under the auspices of governmental authority.  *See Griffin v. City of Opa Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).

The Supreme Court has held that municipalities may be liable for violations of § 1983, but this liability is limited.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).  Municipalities may be sued only for their own unconstitutional or illegal policies; they may not be sued for the acts of their employees.  *Id.* at 691.  As a result, a claim against a municipality under § 1983 must be predicated upon an injury inflicted by governmental policy or custom constituting "official policy." *Id.* at 694.

The existence of a policy or custom sufficient to impose § 1983 liability on a municipal government can be established in several ways.  For example, official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so

persistent and widespread as to practically have the force of law. *Connick v. Thompson*, __U.S.__, __, 131 S. Ct. 1350, 1359 (2011). A plaintiff can also demonstrate official policy by showing a government policy of inadequate training or supervision. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). In this regard, the municipality is deemed liable for its deliberate indifference to the rights of those affected by its policy of inadequate training. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Here, the Amended Complaint fails to sufficiently plead facts establishing the applicability of any of these theories of liability.

### 1. The Drug Policy as the City's "Official Policy"

In alleging that the City of Riviera Beach is liable under § 1983, Hudson points to the drug-test policy contained in the parties' collective-bargaining agreement. Under the City's drug policy, an employee may be required to undergo drug testing based on "reasonable suspicion" of the employee's drug use. Hudson argues that Defendants lacked reasonable suspicion when they ordered him to submit to the drug test. This contention, however, seems to predicate liability on Defendants' failure to follow policy procedure, rather than on the unconstitutionality of the policy itself. "That a plaintiff has suffered a deprivation of federal rights at the hands of municipal employees will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably." *Brown*, 520 U.S. at 406-07. Thus, Hudson cannot establish municipal liability under § 1983 by merely alleging that municipal employees violated the City's policy. This would amount to a *respondeat superior* theory of liability, which the Supreme Court expressly rejected in *Monell.* Consequently, the Court declines to impose liability on the City on this basis.

## 2.   Official Policy by Individual with Final Decisionmaking Authority

Alternatively, the Court construes the Amended Complaint as alleging that the decision to drug-test Hudson constituted the "official policy" for which Perry was the final decisionmaker.  In appropriate circumstances, a single action taken by a local official may give rise to municipal liability.  "If the decision to adopt [a] particular course of action is properly made by [the] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). The Supreme Court has emphatically noted, however, that not every decision by municipal officers will automatically subject the municipality to § 1983 liability.  Rather, "municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Id.*  An official's discretion to undertake certain functions, alone, is not sufficient to impose liability on the municipality based on the exercise of that discretion.  *Id.*  The official must also be responsible for establishing "final government policy."  *Id.*

Here, Hudson asserts that Perry was the "final decisionmaker" in ordering Hudson to submit to the drug test.  D.E. 17 at ¶ 55.  This statement is wholly conclusory.  Although the Amended Complaint alleges that Perry made the decision to drug test Hudson, the allegations do not support the contention that Perry was responsible for establishing *final* City policy with respect to drug-testing procedures.  Moreover, Perry's directive was ultimately limited to compliance with the City's drug policy.  The crux of the Amended Complaint, however, is that Perry failed to abide by that policy.  Therefore, the allegations in the Amended Complaint contain no basis to conclude that Perry somehow established "final" City policy in making a decision under an already-existing policy. Accordingly, municipal liability is not warranted on these grounds.  The very purpose of the "official

policy" requirement is to distinguish acts of the municipality from acts of employees of the municipality "and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. 479.  To hold the City liable for Perry's actions would run contrary to this mandate.

### 3.  Failure to Train

In limited circumstances, a plaintiff may assert a § 1983 claim against a municipality by establishing a government policy of inadequate training or supervision.  The Supreme Court has cautioned, however, that a municipality's culpability "is at its most tenuous where a claim turns on failure to train." *Connick*, 131 S. Ct. at 1359.  "A plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  According to Plaintiff, the City is liable under a failure-to-train theory of municipal liability because it should have been aware that the drug policy implicated employees' Fourth Amendment rights, and the City failed to adequately train employees regarding the standard for reasonable suspicion.

In alleging that a municipality's failure to train constitutes a sufficient "policy or custom,"

> [i]t is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens. . . . [It] also requires a likelihood that the failure to train or supervise will result in the officer making the wrong decision.  Where the proper response . . . is obvious to all without training or supervision, then the failure to train or supervise is generally not "so likely" to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise.

*Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997) (quoting *Walker v. City of New York*, 974 F.2d 293, 299-300 (2d. Cir. 1992) (internal quotation marks omitted).   A showing of deliberate indifference can be established by alleging a pattern of similar constitutional violations by untrained employees.   *Connick*, 131 S. Ct. at 1360.   Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability."   *Id.* (quoting *Brown*, 520 U.S. at 407) (internal quotation marks omitted).   Without such notice, decisionmakers cannot be said to have acted with deliberate indifference with respect to the policy at issue.   *See id.*; *see also Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998) ("This Court repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise.").

In this case, the Court agrees with Defendants that simply alleging that the drug policy implicates Hudson's Fourth Amendment rights is not sufficient to state a cause of action based on the theory that the City failed to adequately train or supervise its employees.   The Amended Complaint maintains that Perry improperly required Hudson to submit to a drug test.   It further contends that this conduct can be attributed to the City because it did not train employees regarding the proper procedures under the policy, and as a result, the City had a policy, practice, and custom of improperly imposing drug testing on employees.   But this is not enough to support a failure-to-train claim.

Although Hudson alleges a "pattern and custom" of imposing drug testing without reasonable suspicion, the facts in the Amended Complaint do not support that allegation.   Rather, the allegations

seem to indicate that Hudson's claims arise from the actions of a single individual.  All of Hudson's allegations revolve around Hudson's assertion that Perry drug-tested him based on insufficient suspicion of wrongdoing, and further, that Perry had been drug-testing employees that way for years. But even if Perry's action were improper, this assertion is insufficient to impose liability on the City. The Amended Complaint contains no allegation that the City was on notice of these alleged violations, nor do the facts lend themselves to a plausible inference of such notice.  Without notice of its employees' violations, the City cannot be said to have acted with deliberate indifference. Recognizing that the Supreme Court has imposed a stringent standard for imposing liability on municipalities, the Court finds that the Amended Complaint fails to meet this necessary threshold.

Nor is this analysis changed by the fact that evidence of prior incidents is not required to establish city policy if the need to train and supervise in the particular area in issue is "so obvious" and the likelihood of constitutional violations is "highly predictable." *Gold*, 151 F.3d at 1352 (citing *City of Canton*, 489 U.S. at 378).  The Supreme Court has cautioned that this exception applies in only a narrow range of circumstances. *See Brown*, 520 U.S. at 398.  In this respect, the Supreme Court has provided a hypothetical example, recognizing an obvious need for training in the use of deadly force where firearms are provided to police officers:  "[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *See City of Canton*, 489 U.S. at 390 n.10.  Hudson has not alleged that such an obvious need for

-14-

training is present here, nor does the Amended Complaint contain any indication that a constitutional violation of the drug-testing policy is highly predictable.

In short, the allegations of the Amended Complaint fail to establish that the City either knew of a need to train or supervise in this particular area or that the City deliberately chose not to act. Moreover, aside from the Amended Complaint's conclusory statements, no allegations demonstrate that the alleged constitutional violations resulted from the City's failure to properly train its employees.  Accordingly, Counts I and II of the Amended Complaint are dismissed without prejudice.  Plaintiff shall have until November 27, 2013, to replead these counts, should he wish to do so.

### B.  Liability of Individual Defendants[5]

The Court now turns to the claims against the individual Defendants.  In alleging a claim under § 1983, Hudson asserts deprivations of his federal rights under the Fourteenth, Fourth, and First Amendments.  The Court addresses these claims in turn.

#### 1.  Fourteenth Amendment Procedural-Due-Process Claims
#### (Count III Against Perry, Counts IV and V
#### Against Shuttlesworth, Count VII Against White)

The Fourteenth Amendment restrains the states from depriving a person of life, liberty, or property without due process of law.  The tenets of procedural due process include notice and

---

[5]Hudson has sued the individual Defendants in both their individual and official capacities.  *See* D.E. 17 at Counts III-VII.  Because official-capacity suits are simply another form of pleading an action against the entity of which the officer is an agent and Hudson has already named the City of Riviera Beach as a Defendant, the claims against the individual Defendants in their official capacities are redundant.  *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1989).  Moreover, for the reasons that Counts I and II fail to state a claim for municipal liability, Counts III through VII likewise fail to state such a claim.  Accordingly, the claims against Defendants in their official capacities are stricken.

opportunity to be heard.  *See Matthews v. Eldridge*, 424 U.S. 319, 348 (1976).  In other words, before a deprivation of property or liberty takes place at the hands of the state, "the affected person must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Zisser v. Fla. Bar*, 747 F. Supp. 2d 1303, 1316-17 (M.D. Fla. 2010) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).  Thus, the core of procedural due process is "a guarantee of fair procedure."  *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).  In analyzing a procedural-due-process claim, the Court must address two questions: (1) whether the plaintiff has a cognizable interest of which state action has deprived him, and (2) if so, whether the plaintiff received sufficient process regarding that deprivation.  *Ross v. Clayton Cnty., Ga.*, 173 F.3d 1305, 1307 (11th Cir. 1999).

### a.  Plaintiff Has Pled a Cognizable Interest

A public employee has a property interest in employment if "existing rules or understandings that stem from an independent source such as state law create a legitimate claim of entitlement." *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577-78 (1972)).  "Generally, a public employee has a property interest in continued employment if state law or local ordinance in any way 'limits the power of the appointing body to dismiss an employee.'"  *Id.* (quoting *Barnett v. Housing Auth. of Atlanta*, 707 F.2d 1571, 177 (11th Cir. 1982)).  But no property right in government employment exists if an employee is subject to discharge at will and no showing of good cause is necessary to terminate his employment.  *Tie Qian v. Secretary, Dep't of Veterans Affairs*, 432 F. App'x 808, 811 (11th Cir. 2011); *see also Blanton v. Griel Memorial Psychiatric Hosp.*, 758 F.2d 1540, 1543 (11th Cir. 1985) ("[A] state employee who may be discharged at will under state law does not have a property interest in his continued employment and is not entitled to the protection

-16-

of due process."). Thus, to enjoy a protected property interest in employment, a person must have more than a "mere unilateral expectation" of continued employment. *Warren v. Crawford*, 927 F.2d 559, 563 (11th Cir. 1991) (citing *Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

Here, the Amended Complaint sufficiently asserts that Hudson had a property right in his continued employment with the City. Although Defendants are correct in stating that the mere fact that Hudson was employed by the City is not enough to establish a cognizable property interest, Hudson alleges that his property right arises from his union contract. D.E 17 at ¶ 84 ("Hudson had a property interest in his state created job through the Union contract."). And, while the collective-bargaining agreement was not provided to the Court in its entirety, the portions of the contract that were demonstrate that Plaintiff had a legitimate claim of entitlement to his job. Indeed, the fact that Plaintiff was entitled to an administrative hearing prior to his termination indicates that he was not simply an at-will employee; rather, at least some process was required before discharging him. Thus, the Amended Complaint adequately alleges a recognized property interest under the Fourteenth Amendment.

### b. Plaintiff Has Not Sufficiently Pled that the State Failed to Provide Adequate Due Process

Once the court finds that a protected interest exists, the court must consider whether the plaintiff received adequate process before being deprived of that interest. Due process requires "some kind of hearing" prior to the discharge of an employee who has a constitutionally protected interest in his employment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citing *Roth*, 408 U.S. at 569-70). While a pre-termination hearing is required, "it need not be elaborate." *Id.* at 545. Rather, "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Id.*

(alteration in original) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)) (internal quotation marks omitted).  In general, "something less than a full evidentiary hearing is sufficient prior to adverse administrative action."  *Id.* (quoting *Matthews*, 424 U.S. at 343) (internal quotation marks omitted).

Defendants maintain that Hudson received sufficient due process because he was provided with notice and an opportunity to be heard before his termination.  In fact, Hudson received both a pre-termination hearing and a post-termination hearing.  After his temporary suspension, but before his final termination, the City provided Hudson with an administrative hearing.  He was subsequently permitted to appeal the City's termination decision before the City's Civil Service Board.

Hudson concedes that he received these hearings.  What Hudson disputes is the adequacy of the hearing procedures in complying with his due-process rights.  Hudson contends that the hearings were constitutionally deficient for three reasons: (1) he did not receive a sufficient opportunity to rebut the allegations against him; (2) the City failed to conduct the hearings in accordance with its own policy; and (3) the proceedings were tainted by bias.

Because Hudson has not established that his state remedies were inadequate, however, his procedural-due-process claims must fail.  Although due-process requirements vary by context and involve a balancing of interests, the Fourteenth Amendment's essential requirements include "notice and opportunity to respond."  *Loudermill*, 470 U.S. at 546.  This means that the "opportunity to present reasons, either in person or in writing, why a proposed action should not be taken is a fundamental due process requirement."  *Id.*  Thus, a public employee is entitled to an explanation of the employer's evidence and an opportunity to present his side of the story.  *Id.* (citing *Arnett v. Kennedy*, 416 U.S. 134, 170-71 (1974) (Powell, J., concurring)).  Furthermore, it is axiomatic that

the "Constitution requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994).

Nonetheless, in a case of this nature, a due-process violation can be established only by showing that the state refused to provide a means to correct the alleged deficiency at issue.  In *McKinney*, for example, the Eleventh Circuit held that a terminated public employee was not deprived of procedural due process where the Florida courts had the power to remedy the alleged deficiencies in the process by which the employee was terminated.  *See McKinney*, 20 F.3d at 1565. The plaintiff in *McKinney* alleged that his termination by the Board of County Commissioners was unconstitutional because the Board was biased against him.  *Id.* at 1561.  The Eleventh Circuit noted, however, that "a demonstration that the decisionmaker is biased . . . is not tantamount to a demonstration that there has been a denial of due process."  *Id.* at 1562.  In an employment-termination case, due process does not require the state to provide an impartial decisionmaker at the pre-termination hearing; the state "is obligated only to make available the means by which [the employee] can receive redress for the deprivations."  *Id.* (alterations in original) (citation and internal quotation marks omitted).  Thus, even if a plaintiff has suffered a procedural *deprivation*, the Eleventh Circuit determined that a plaintiff has not suffered a due-process *violation* unless the state refuses "to make available a means to remedy the deprivation."  *Id.* at 1563 (emphasis in original). Because Florida courts have the power to review public employee employment-termination cases and because the scope of that review encompasses claims of due-process violations, the Eleventh Circuit concluded that the state had not deprived the plaintiff in *McKinney* of procedural due process. *Id.*

The Eleventh Circuit in *McKinney* relied on the Supreme Court's holdings in *Parratt v. Taylor*, 451 U.S. 527 (1981) and *Hudson v. Palmer*, 468 U.S. 517 (1984), which held that due process does not require pre-deprivation protection where the deprivation results from a negligent or intentional deprivation. *Id.* Since McKinney's claims arose from his allegations that the proceedings were biased, the Eleventh Circuit concluded that *Parratt* applied because any bias on the part of the Board was the product of the intentional and unsanctioned acts of the commissioners. *Id.* Because the state cannot be expected to predict such unauthorized acts, a plaintiff's remedy in this regard is limited to post-deprivation redress. *See id.* Thus, the state must have an opportunity to apply its remedial procedures — including, among others, state-court redress — before a due-process violation by the state can even occur.

In this case, Plaintiff alleges that the proceedings were biased against him and inadequate because the City failed to follow its own procedures required by the collective-bargaining agreement. Both of these allegations complain of intentional acts that the City could not have predicted when it created the grievance-resolving process embodied in the Agreement. Hudson does not challenge the constitutionality of a policy itself; instead, he challenges the City's failure to comport with its own procedural requirements.

As a result, *McKinney* requires Hudson to seek redress of his alleged deprivation through, among other channels, the state-court system. In *McKinney*, the Eleventh Circuit expressly found that Florida courts have the power to review employment-termination cases, which encompasses resolution of employees' procedural-due-process claims. *McKinney*, 20 F.3d at 1563. As the court noted, Florida circuit courts "possess broad powers of review" on certiorari. *Id.* (citing *City of Deerfield Beach v. Vaillant*, 419 So. 2d 624, 626 (Fla. 1982)). The court further explained, "Where

a party is entitled as a matter of right to seek review in the circuit court from administrative action, the circuit court must determine whether procedural due process is accorded, whether the essential requirements of the law have been observed, and whether the administrative findings and judgment are supported by competent substantial evidence." Because Florida courts are required to make these determinations, the Eleventh Circuit concluded that the Florida courts' review "more than satisfies *Parrat's* post-termination process requirement." *Id.*

Here, Hudson could have sought state-court review, but the Amended Complaint does not assert that he did and that he was denied due process by Florida courts. Because, under the rationale of *McKinney*, no state procedural-due-process violation can occur unless and until the state has had every procedural opportunity to remedy an alleged deprivation of a protected interests, Hudson's failure to plead that he attempted to obtain relief from Florida courts but that they somehow violated his procedural due process dooms Hudson's procedural-due-process claim as currently pled. Accordingly, Counts III, IV, V, and VII are dismissed with respect to Plaintiff's Fourteenth Amendment claims. Plaintiff shall have until November 27, 2013, to replead these claims if he has sought state-court review and asserts that the state courts have also denied him procedural due process.

### 2. Fourteenth Amendment Substantive Due Process Claim

In contrast to procedural due process, the substantive component of the Due Process Clause of the Fourteenth Amendment protects against government interference with certain fundamental rights and liberties. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000). It is not clear from the Amended Complaint whether Plaintiff raises a substantive-due-process claim. Because the parties briefed the issue, though, the Court addresses this claim below.

-21-

In accordance with Supreme Court precedent, the Eleventh Circuit no longer recognizes substantive-due-process claims for pretextually terminated public employees. *See McKinney*, 20 F.3d 1550. Because employment rights are created by state law and thus not "fundamental rights" protected by the Constitution, they are not entitled to substantive-due-process protection. *Id.* at 1560. As a result, an employee's property right in employment is protected only by the procedural component of the Fourteenth Amendment Due Process Clause. *Id.* Consequently, to the extent that Hudson may have brought a claim based on a violation of his substantive-due-process rights, that claim is dismissed with prejudice.

### 3.  Fourth Amendment Claim
### (Count III Against Perry, Count IV
### Against Shuttlesworth, Count VII Against White)

The City's drug-testing policy set forth in the Agreement requires that the employer have reasonable suspicion of the employee's drug use before submitting an employee to a drug test. Hudson asserts that no suspicion at all supported Perry's decision to drug-test him. Therefore, he avers, the drug test constituted an unreasonable search in violation of the Fourth Amendment.

For their part, Defendants contend that Hudson's Fourth Amendment claim is precluded because the issue of "reasonable suspicion" was decided during the grievance process, and the Court is therefore bound by that determination. This Court agrees with Hudson that if, indeed, Perry ordered Hudson drug-tested without any suspicion whatsoever, Hudson may be able to state a claim for violation of his Fourth Amendment right, as incorporated by the Fourteenth Amendment, to be free of unreasonable searches.

*a.  The Grievance-Process Decision Does Not Preclude Hudson's Fourth Amendment Claim*

After Hudson was placed on suspension, he pursued redress in accordance with the City's

grievance procedures outlined in the Agreement.  The Agreement contains a detailed, five-step, elective grievance process.  *See* D.E. 29-1.  An employee may choose to participate in the grievance and arbitration procedure outlined by the Agreement, or an employee may waive that process at any point and file an action in court or before the Public Employees Relations Commission or any other administrative agency.  *See id.* at Art. 9, §§ 7, 8.

If an employee elects to take advantage of the grievance and arbitration procedure, Step One allows the employee to initiate a written grievance with the employee's supervisor.  If the grievance is not then resolved, Step Two authorizes the employee to appeal to the department director.  *Id.* at Art. 9, § 9.  Steps Three and Four permit an appeal to the Director of Human Resources and to the City Manager, respectively.  *Id.*  Finally, Step Five provides for arbitration of the grievance before a neutral arbitrator and states that "any matter within the arbitrator's jurisdiction shall be final and binding on the Union, the City, and the employees covered by the agreement."  *Id.*  The Agreement further states that all eligible employees have the right of appeal, either through the negotiated grievance process contained within the Agreement or through the City Civil Service Appeals procedure.  *Id.* at Art. 9, § 10.

It is not clear from the Amended Complaint what steps of the grievance procedure Hudson actually undertook.  In this respect, Hudson avers only that he wrote a grievance letter to Shuttlesworth, that he was provided an administrative hearing prior to his termination, and that the City "denied [him] the initial grievances outlined in the city union contract."  D.E. 17 at ¶¶ 73, 79.  Hudson makes no mention of whether the grievance was submitted to arbitration.  Following his discharge, Hudson elected to appeal the decision to the Civil Service Board.  The Amended Complaint does not set forth the outcome of the appeal, although it does allege that "[t]he process

in selecting the civil service board was biased and dictated by Perry" and that the board "could not

have provided the relief sought for violations of plaintiffs [sic] constitutional rights."  D.E. 17 at ¶¶

92, 94.

The City argues that this Court may not hear Hudson's Fourth Amendment claim because

"the issue of whether Defendants had a reasonable suspicion to require Hudson to undergo a drug

test is an issue of contract interpretation which must be addressed pursuant to the grievance and

arbitration process."  *See* D.E. 29 at 11.  This argument actually raises two issues: (1) Does the mere

existence of the grievance-process decision regarding Hudson's determination preclude judicial

review of Hudson's Fourth Amendment claim? and (2) If it does not, is this Court bound by the

factual findings of the grievance process?  This Court concludes that the answer to both questions

is "no."

a. *Judicial Review of Hudson's Fourth Amendment Claim Is Not Precluded Simply Because Hudson*
   *Submitted to the Grievance Process*

A line of Supreme Court cases stemming from 1974 demonstrates that the mere fact that the

grievance procedure considers an employee's contractual claim does not necessarily preclude that

employee from bringing a federal case alleging that the city or state violated the employee's statutory

or constitutional rights through the same action that was the subject of the employee's contractual

claim.  Beginning with *Alexander v. Gardner-Denver*, 415 U.S. 36 (1974), the Court considered the

case of a terminated employee who sued his former employer for race discrimination under Title VII

of the Civil Rights Act of 1964.  The plaintiff's employment was covered by a collective-bargaining

agreement that prohibited discrimination against any employee on the basis of race and guaranteed

that no employee would be discharged except for just cause.  *Gardner-Denver*, 415 U.S. at 39.

Initially, the plaintiff filed a grievance under the collective-bargaining agreement, claiming that he

had been unjustly discharged. *Id.* At some point during the grievance process, he also asserted that his discharge resulted from racial discrimination. *Id.* at 42. When the grievance proceeded to arbitration, the arbitrator ultimately ruled that the plaintiff employee had been discharged for just cause. *Id.* The plaintiff subsequently brought suit in federal court, and both the district court and the Tenth Circuit concluded that the plaintiff was precluded from bringing his Title VII claim because he had already pursued a grievance under the non-discrimination clause of the collective-bargaining agreement and was thereby bound by the arbitral decision. *Id.* at 43.

The Supreme Court reversed the Tenth Circuit's decision, however, holding that the plaintiff's federal statutory claim was not barred. In so holding, the Supreme Court highlighted the distinction between the contractual rights conferred by a collective-bargaining agreement and statutory rights granted by Congress. *Id.* at 49-50. As the Court noted, "In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress." *Id.* Nor, the Court reasoned, is the "distinctly separate nature" of these rights "vitiated merely because both were violated as a result of the same factual occurrence." *Id.* at 50. Thus, even though the plaintiff's claims in both forums were based on discriminatory termination, the Supreme Court remarked that "no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums." *Id.* Instead, "the relationship between the forums is complementary since the consideration of the claim by both forums may promote the policies underlying each." *Id.* Consequently, the arbitrator's decision with respect to the interpretation of the collective-bargaining agreement did not prevent the plaintiff from bringing a Title VII claim in federal court—regardless of whether the "contractual rights [were] similar to, or

duplicative of, the substantive rights secured by Title VII."[6]  *Id.* at 53-54.

The Supreme Court reached a similar conclusion several years later in *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728 (1981).  There, several truck drivers pursued wage claims against their employer under the Fair Labor Standards Act ("FLSA").  *Barrentine*, 450 U.S. at 730.  Before the federal lawsuit was filed, the employees submitted their wage claims to a joint grievance committee pursuant to the union's collective-bargaining agreement.  *Id.*  The collective-bargaining agreement required that the employer compensate the drivers "for all time spent in [its] service."  *Id.*  When the grievance committee rejected the employees' claims for wages that they alleged that they had incurred while serving the employer, the employees filed suit.  The district court and the Eighth Circuit Court of Appeals refused to address the merits of the plaintiffs' FLSA claims, concluding that the statutory claims were barred since the plaintiffs had submitted their wage disputes to the grievance committee.  *Id.* at 734.

As in *Gardner-Denver*, the Supreme Court reversed, rejecting the contention that the employees' statutory claims were precluded simply because they had made use of the procedures provided by the collective-bargaining agreement.  While the Court noted that courts ordinarily defer to collectively bargained-dispute-resolution procedures when the parties' dispute arises out of the

_____

[6]This Court recognizes that the Supreme Court has disavowed *Gardner-Denver*'s discussion about the "inferior[ity]" of arbitration to the judicial process for resolving statutory claims.  *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 34 n.5 (1991) (citation omitted).  The rejection of that aspect of *Gardner-Denver* and its progeny, however, does not affect the analysis here.  First, the rest of *Gardner-Denver*'s reasoning — on which the analysis in this case relies — remains intact.  Second, this case involves a constitutional claim made actionable through a statute, not merely a statutory claim.  Third, in invalidating the argument that arbitration is inferior to the judicial process, the Supreme Court explained that "not . . . all controversies implicating statutory rights are suitable for arbitration."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985).

collective-bargaining agreement, it emphasized that "different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." *Id.* at 737. Thus, the unsuccessful arbitration did not bar the plaintiff's federal lawsuit.

Finally, and most significantly as relevant to the instant case, in *McDonald v. West Branch*, 466 U.S. 284 (1984), the Supreme Court determined the effect of an arbitral dispute on an employee's § 1983 claim. In that case, a discharged employee filed a grievance pursuant to a collective-bargaining agreement, contending that the employer had no "proper cause" for his termination. 466 U.S. at 286. When the grievance procedure did not end in the employee's favor, he brought suit in federal court under § 1983, alleging that he had been discharged for exercising his First Amendment rights. *Id.* at 287. Citing *Gardner-Denver* and *Barrentine*, the Court noted that according preclusive effect to arbitration awards in § 1983 actions would "severely undermine the protection of federal rights that the statute is intended to provide" and thus concluded that the employee's claim was not barred by the determination of the grievance proceeding. *Id.* at 292. Indeed, the Supreme Court emphasized that "[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights — to protect the people from unconstitutional action under color of state law." *Id.* at 290 (citation and quotation marks omitted).

These Supreme Court cases require the conclusion that, contrary to Defendants' suggestion, Hudson's Fourth Amendment claim is not barred by the determination of the grievance procedure. The Agreement in this case specifies that its grievance procedures apply to complaints "arising out of an alleged violation concerning the application, interpretation, or compliance with the *provisions*

-27-

*of this Agreement.*" D.E. 29-1 at Art. 9, § 3 (emphasis added). Thus, even assuming that the issue of reasonable suspicion was resolved during those proceedings,[7] that determination was made pursuant to Hudson's contractual rights under the collective-bargaining agreement. In the pending matter, however, as in *McDonald*, Hudson seeks vindication of his federal constitutional rights under Section 1983. Because contractual rights, on the one hand, and statutory and constitutional rights, on the other, "have legally independent origins are equally available to the aggrieved employee," *see Gardner-Denver*, 415 U.S. at 52, Hudson's submission to the grievance procedure does not preclude Hudson from raising the alleged violations of his constitutional rights in federal court.

b. *To the Extent that the Grievance Process Made a Factual Finding that the City Had Reasonable Suspicion to Drug-test Hudson, that Factual Finding Does Not Preclude the Court From Considering the Same Factual Issue Anew*

Defendants next suggest that whether Defendants had reasonable suspicion to drug-test Hudson — and thus, effectively, whether Defendants violated Hudson's Fourth Amendment rights — constitutes an issue of fact that the grievance process addressed and that this Court is bound by the grievance process's factual determination on this issue. Under the circumstances of this case, this Court must disagree.

Of course, as Defendants suggest, "judicial review of the decision rendered by [a] grievance procedure is quite narrow" and that "ordinarily the worker will be bound by the result." *Hayes v. Reynolds Metals Co.*, 769 F.2d 1520, 1522 (11th Cir. 1985). But that is not always the case.

In *University of Tennessee v. Elliott*, 478 U.S. 788 (1986), the Supreme Court set forth a test for determining whether a federal court should give preclusive effect to the unreviewed factual

---

[7] The record contains no allegation by either party concerning what factual or legal findings were made during the grievance process. Thus, whether the issue of "reasonable-suspicion" was in fact decided is uncertain.

findings of a state administrative body.  Specifically, the Court held that "when a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." 478 U.S. at 799 (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966) (alteration in original) (internal quotation marks omitted).

Here, Defendants' problem arises from the fact that the Amended Complaint sets forth allegations that establish that the grievance process and the civil service board failed to operate in a "judicial capacity" and that Hudson did not receive an "adequate opportunity" to litigate his claims. While it is true that the administrative hearings provided to Hudson did, in some respects, resemble judicial proceedings in that evidence was presented and Hudson was represented at that time by counsel, *see* D.E. 17 at ¶¶ 76, 80, Hudson's claims of bias cutting to the core of the proceedings preclude this Court from finding that *Elliott*'s "judicial capacity" and "adequate opportunity" requirements are satisfied.  As the Supreme Court has observed, for a tribunal to act in a judicial capacity, it must be impartial.  *See Withrow v. Larkin*, 421 U.S. 35 (1975) (noting that the requirement of a fair and unbiased tribunal applies to administrative agencies).  Here, Hudson bases his entire claim on the contention that the grievance board was biased against him, having been appointed by Perry, who allegedly had a vendetta against Hudson.  Assuming the truth of Hudson's allegations, as the Court must on a motion to dismiss, these allegations prevent the grievance board's findings from having a preclusive effect.

This concept is well illustrated in the Fourth Circuit's decision in *Hall v. Marion School District Number 2*, 31 F.3d 183 (4th Cir. 1994).  In that case, the plaintiff, a teacher, brought suit in

federal court under § 1983, asserting that her termination was retaliatory and that it violated the plaintiff's First Amendment rights.  Previously, the school board had held a hearing at which it had concluded that the plaintiff should be dismissed as a teacher with the school district.  *Id*. at 190.  As a result of that hearing, the defendant school district asserted that the plaintiff was collaterally estopped from litigating her First Amendment claim.  *Id.*  The district court disagreed, finding as a matter of fact that the school board had been involved in a vendetta to fire the plaintiff, so the board "was not a neutral and detached arbiter." *Id.* at 191.  Relying on *Elliott*, the Fourth Circuit affirmed, holding that the plaintiff was not barred from asserting her § 1983 claim because "when there has been a finding of actual bias on the part of the administrative body adjudicating a claim, that decisionmaker is clearly not acting in a judicial capacity."  *Id.* at 192.

The Eleventh Circuit arrived at a similar conclusion in *Thornquest v. King*, 61 F.3d 837 (11th Cir. 1996).  There, several professors brought a § 1983 action against various community-college administrators and the board of trustees.  One of the plaintiffs had been terminated based on the college president's allegation that the plaintiff was guilty of misconduct, gross insubordination, and willful neglect of duty.  *Id.* at 840.  The board of trustees subsequently held a public hearing at which it rejected the plaintiff's claim of unconstitutional retaliation and granted the president's discharge petition.  *Id.*  The district court ultimately determined that the board's action precluded it from considering the plaintiff's claims.  *Id.*

On appeal, the Eleventh Circuit reversed the district court's holding, noting that before a court may determine whether agency fact-finding is entitled to preclusive effect, the federal court must ascertain "that the parties had an 'adequate opportunity' to litigate the issues before the administrative agency." *Id.* at 841 (quoting *Elliott*, 478 U.S. at 799).  The court further stated that

-30-

adequacy in this context refers to a "full and fair opportunity" and that "an administrative hearing cannot be deemed fair if there was 'actual bias' on the part of the administrative decisionmaker." *Id.* (citing *Burney v. Polk Cmty. Coll.*, 728 F.2d 1374, 1378 n.11 (11th Cir. 1984). Thus, "if the tribunal is found to have been biased, the person appearing before it would not have had an adequate opportunity to be heard and the tribunal's findings would be entitled to no preclusive effect at all." *Id.* Because, the plaintiff had presented an adequate claim of bias, the Eleventh Circuit concluded that the board's actions were not entitled to preclusive effect.[8]

In this case, Hudson has sufficiently alleged that the grievance proceedings were biased. The Amended Complaint is rife with allegations that Perry had a personal vendetta against Hudson and that she directed the drug testing for no reason other than vengeance. Hudson asserts that during his pre-termination hearing, Perry, his initial accuser, was permitted to make the ultimate decision on whether to terminate Hudson's employment. He further contends that on appeal before the Civil Service Board, the City allowed Perry to select the Board's hearing officer and that Perry chose a personal friend of hers without the Board's consent. These allegations, accepted as true, are sufficient to support a finding of bias. Thus, the Court cannot conclude that the grievance board was acting in a judicial capacity or that Hudson had an adequate opportunity to litigate the factual issues in dispute. For these reasons, any factual finding concerning the issue of reasonable suspicion by

---

[8] The Eleventh Circuit's opinion in this case was subsequently superseded on rehearing by *Thornquest v. King*, 82 F.3d 1001 (11th Cir. 1996). The later opinion, however, was decided on other grounds and did not address the issue of bias in the board's proceedings. In particular, the Eleventh Circuit determined that the plaintiff's claims were not barred because the board of trustees was acting as the plaintiff's employer when it discharged him and thus could not have been acting in a judicial capacity as required by *Elliott*. *Id.* at 1004. Nevertheless, the Eleventh Circuit's original opinion in *Thornquest* is instructive and consistent with the Fourth Circuit's reasoning in *Hall*.

the grievance process or the Civil Service Board would not be entitled to preclusive effect, if the allegations of bias are proven.

Nor, contrary to Defendants' suggestion, does *Dykes v. Southeastern Pennsylvania Transportation Authority*, 68 F.3d 1566 (3d Cir. 1995), affect the analysis.  In *Dykes*, the Third Circuit held that, while the issue of whether a particular search is reasonable under the Fourth Amendment concerns a question of law, the sub-issue of whether "reasonable suspicion" existed to drug test an employee under a collective-bargaining agreement presents only a question of fact to be determined during the course of the grievance process.  *Id.* at 1570.  Although the plaintiff argued that his employer had not complied with the pertinent drug policy, the Third Circuit dismissed his claim, concluding that it was bound by the administrative finding that reasonable suspicion warranted the plaintiff's drug test.

Unlike the present case, however, *Dykes* contained no allegation of bias during the grievance procedure that would warrant a limitation on the preclusive effect of the administrative factual finding.  Rather, the Third Circuit simply noted that the issue of reasonable suspicion had been resolved during the grievance process, and therefore, the Court had to defer to that interpretation of the collective-bargaining agreement.  Because the Amended Complaint in this case calls into question the impartiality of the administrative hearings, the facts here are easily distinguishable from *Dykes* and do not provide support for the Court to hold the findings of the grievance process and the civil service board determinative of Hudson's Fourth Amendment claims.

c.  *The Amended Complaint States a Cause of Action Against Perry, but Not Against Shuttlesworth and White*

Finally, the Court considers the adequacy of Hudson's Fourth Amendment claims.  In his Amended Complaint, Hudson asserts that the drug testing constituted an unreasonable search and

seizure in violation of the Fourth Amendment.  The Fourth Amendment protects individuals from unreasonable searches conducted by the government.  It is well settled that the Fourth Amendment's protection "extends beyond the sphere of criminal investigations," "without regard to whether the government actor is investigating crime or performing another function."  *City of Ontario v. Quon*, 560 U.S. 746, 130 S. Ct. 2619, 2627 (2010).  Thus, the Fourth Amendment applies "even when the government acts as an employer."  *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989).

Here, the parties do not seem to dispute that the drug testing constituted a search within the meaning of the Fourth Amendment.[9]  Thus, the Court must consider whether the Amended Complaint asserts sufficient allegations to establish the plausibility of Hudson's claim that the search was not reasonable.  Generally, in order for a search to be reasonable, it must be based on individualized suspicion of wrongdoing.  *Chandler v. Miller*, 520 U.S. 305, 314 (1997).  Although no fixed threshold of suspicion is required, in the context of government employment, intrusions on the protected privacy interests of government employees for non-investigatory, work-related purposes, as well as for investigations of work-related misconduct are judged by an amorphous standard of reasonableness.  *See O'Connor v. Ortega*, 480 U.S. 709, 726 (1987) (plurality opinion);

---

[9] In this case, Plaintiff was subjected to a breathalyzer test, urine test, and hair sample test.  D.E. 17 at ¶ 28.  The breath and urine tests are indisputably searches within the parameters of the Fourth Amendment.  *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, (1989) (noting that breath and urine tests are both intrusions that constitute searches under the Fourth Amendment).  Less clear, however, is  whether hair samples warrant the same constitutional protections.  *See United States v. De Parais*, 805 F.2d 1447, 1456 (11th Cir. 1986) ("Federal courts are undecided as to whether the involuntary removal of hair samples constitutes a search and seizure under the Fourth Amendment.").  Nonetheless, because a search was undertaken at least with respect to the breathalyzer and urinalysis, the Court does not need to resolve the hair-sample issue at this juncture.

-33-

*see also Everett v. Napper*, 833 F.2d 1507, 1511 (11th Cir. 1987).  In determining the reasonableness of a search in this area, the Court evaluates whether the search was justified at its inception and whether the search was reasonable in scope.  *Everett*, 833 F.2d at 1511.  This determination requires a balancing of the employee's privacy interests against the government's need for supervision, control, and efficient operation of the workplace.  *O'Connor*, 480 U.S. at 719.

The Amended Complaint alleges that Perry ordered Hudson to submit to drug-testing based on "several complaints from employees" who claimed that Hudson's "eyes were glassy" and that "he smelled like marijuana."  D.E. 17 at ¶ 35.  Hudson avers, however, that Perry could not subsequently remember who her anonymous source was or whether that source was male or female.  *Id.* at ¶ 36, 38.  In essence, Hudson suggests that Perry fabricated a basis for the drug testing and that, in fact, she had no reasonable basis to require it.  In further support of this theory, the Amended Complaint alleges that, during an administrative appellate hearing, Perry provided a contradictory reason for drug-testing Hudson, stating that she tested Hudson on a "mere hunch" and that she frequently drug-tests employees based on her gut feeling.  *Id.* at ¶¶ 36-37.  Hudson also claims that Perry never personally corroborated any of the allegations from her purported sources.  *Id.* at ¶¶ 23-24.

Even more significant, however, are the allegations underlying Hudson's contention that Perry's decision was motivated by personal animosity.  Hudson avers that he and Perry's son Troy had a disagreement shortly after Hudson was hired and that Troy subsequently sought to have Hudson reprimanded.  *Id.* at ¶ 2.  When those efforts failed, Hudson claims, Troy cautioned that the situation was "not over."  *Id.*  Shortly after the change in the City's management, Hudson was ordered to undergo the drug test.  *Id.*  Thus, Hudson contends that Perry's intentions were in fact malicious.  *Id.*  Hudson further supports this contention with the allegations that Perry was not

Hudson's direct supervisor and that Perry did not consult with Hudson's supervisor before issuing her order.

The allegations in the Amended Complaint plausibly lend themselves to a conclusion that the drug test was unreasonable from its inception. Although Perry eventually told Hudson that she based her decision to search Hudson on tips from anonymous sources, Hudson asserts that the rationale that Perry provided was untimely, unsubstantiated, and based on, at best, her subjective intuition. While it is true that the Fourth Amendment requires no set level of individualized suspicion, where, as here, Hudson's job does not justify suspicionless drug-testing, *some* suspicion is required. Hudson sufficiently alleges that Perry lacked any suspicion whatsoever in ordering his drug test and that she tested him in furtherance of a vendetta only. A governmental search based upon such a purely private and spiteful motivation epitomizes precisely the type of governmental abuse and intrusion against which the Fourth Amendment was intended to protect. If, in fact, Perry ordered the drug-testing simply because she could because of her position and she wished to do so, such a drug search would have been unreasonable. Hudson has sufficiently stated a claim against Perry under the Fourth Amendment.

Although the allegations reasonably plead that Perry initiated an improper search of Plaintiff, the culpability of Shuttlesworth and White concerning this claim is less clear. With respect to Shuttlesworth, Hudson states simply that Shuttlesworth was aware of the drug test and that Hudson wrote Shuttlesworth a letter asking her to direct Perry to end all inquiries regarding the drug test that had already been administered. The Amended Complaint does not identify specifically what Hudson said in the letter, so Shuttlesworth's knowledge concerning the facts about Perry's actions as Hudson portrays them is not apparent. As a result, even assuming their truth, the allegations in the Amended

-35-

Complaint do not make it possible to assess whether Shuttlesworth knowingly violated Hudson's Fourth Amendment rights.

An even more fundamental problem appears to exist with regard to White:  Hudson seems to predicate White's liability on White's subsequent involvement in Hudson's termination—not on the search itself.  Thus, the Amended Complaint as currently drafted does not state a claim against White that White violated Hudson's Fourth Amendment rights.  Because the Amended Complaint does not sufficiently state a Fourth Amendment claim as to Shuttlesworth and White, those claims are dismissed without prejudice, and Hudson shall have until November 27, 2013, to replead them.

### 4. First Amendment Right to Petition (Count VI against Shuttlesworth)

Count VI of the Amended Complaint avers that Defendant Shuttlesworth violated Hudson's First Amendment right to petition.  D.E. 17 ¶¶ 152-61.  According to the Amended Complaint, Shuttlesworth's termination of Hudson after he wrote a letter to the testing facility revoking his authorization to release the results of the drug test to the City amounted to unconstitutional retaliation.

Public employees may maintain a cause of action under the First Amendment when they allege that "government employment decisions were taken in an attempt to chill expression protected by the First Amendment." *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1563 (11th Cir. 1995).  In asserting a retaliatory discharge claim under the First Amendment, a plaintiff must show (1) the employee's speech involves a matter of public concern, (2) the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, and (3) the speech played a substantial part in the government's challenged employment decision.  *Wilbourne v. Forsyth Cnty. Sch. Dist.*, 306 F. App'x 473, 476 (11th Cir. 2009) (quoting *Cook v. Gwinnett Cnty.*

*Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005)); *see also Bryson v. City of Waycross*, 888 F.2d 1563, 1565-66 (11th Cir. 1989). The burden then shifts to the employer to demonstrate that it would have made the same decision even in the absence of the protected speech. *Wilbourne*, 306 F. App'x at 476. Here, Hudson's speech did not involve a matter of public concern, so the Court does not address the remaining elements of the claim.

In determining whether Hudson's speech touched on a matter of public concern, the Court must look to the "content, form, and context" of the communication and determine whether "the 'main thrust' of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was." *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1283 (11th Cir. 2006) (citations omitted). A public employee's speech involves a matter of public concern "if it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Cook*, 414 F.3d at 1319 (quoting *Connick v. Myers*, 461 U.S. 138, 146) (internal quotation marks omitted).

The speech at issue in the present case consists of a letter that Hudson sent to the drug-testing facility requesting the revocation of the results of his drug test, after he was notified that he had a statutory right to revoke the results under HIPAA. Hudson contends that he was subsequently terminated in retaliation for this letter.

The subject matter of Plaintiff's communication deals with a purely private matter that does not implicate any concern of the community. In this regard, the letter was not publicly disseminated, and Hudson's motivation in sending it was decidedly personal — his intent was to prevent his employer from accessing his private information. "[W]hen a public employee speaks not as a citizen

-37-

upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *See Connick*, 461 U.S. at 147. Ultimately, Hudson has not shown, nor can the Court can find, any reason why the results of Hudson's drug test implicate any matter of public interest. Further, the Court finds that an amendment related to this cause of action would be futile because the fact remains that Hudson's letter constituted an altogether private communication not subject to the First Amendment's protections. For this reason, Hudson's First Amendment claim is dismissed with prejudice. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) (noting that a district court may properly deny leave to amend the complaint when such amendment would be futile).

### 5. Florida Drug-Free Work Place Act (Count VIII)

Finally, Hudson alleges that all Defendants violated the Florida Drug-Free Workplace Act by failing to follow the proper procedures in selecting him to submit to a drug test. D.E. 17 at ¶¶ 173-77. Defendants retort that Hudson's claim is precluded because the Act does not provide a private right of action.

Whether a private right of action exists for a violation of a statute is a matter of legislative intent. *United Auto. Ins. Co. v. A 1st Choice Healthcare Sys.*, 21 So. 3d 124, 128 (Fla. 3d DCA 2009); *Baumstein v. Sunrise Cmty., Inc.*, 738 So. 2d 420, 421 (Fla. 3d DCA 1999) ("There is no question that the primary, perhaps the only, issue pertinent to the question of whether a private cause of action may be based upon the breach of a statute is whether the legislature intended that to be the case."). "Absent a specific expression of intent, a private right of action may not be implied."

-38-

*United Auto Ins. Co.*, 21 So. 3d at 128 (citing *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 852 (Fla. 2003)).

As a preliminary matter, the Court must distinguish between the Florida Drug-Free Workplace Act contained in Section 112.0455, Fla. Stat., and the drug-free workplace program requirements outlined in Section 440.102, Fla. Stat.  While the former is applicable to state agencies and their employees, the latter applies to other employers who choose to implement the drug-free workplace program.  The Agreement specifically makes reference to § 440.102 in its description of the City's drug policy, but the Amended Complaint asserts a violation under the "Florida Drug-Free Workplace Act."  Because municipalities are not bound by § 112.0455, which explicitly binds only state agencies, the Court construes the Amended Complaint as asserting a violation under § 440.102.

In establishing the drug-free workplace program, it was the intent of the legislature to

> promote drug-free workplaces in order that employers in the state be afforded the opportunity to maximize their levels of productivity, enhance their competitive positions in the marketplace, and reach their desired levels of success without experiencing the costs, delays, and tragedies associated with work-related accidents resulting from drug abuse by employees.

Fla. Stat. § 440.101.  While it is clear that the Florida legislature intended to encourage employers to institute drug-free work environments, no evidence demonstrates that it intended to create a private right of action for an employer's failure to follow the program's procedures.  Other courts have reached the same conclusion.  *See, e.g.*, *Morrison v. Morgan Stanley Props.*, No. 06-80751-CIV, 2008 WL 1771871, at *6 (S.D. Fla. April 15, 2008) ("There is no evidence in either the statutory language or the legislative structure that the Legislature contemplated a private cause of action against employers who fail to follow drug-free workplace program procedures."); *Turner v. WCA Waste Sys., Inc.*, No. 1:12cv176-SPM/GRJ, 2012 WL 4512908, at *1 (N.D. Fla. Oct. 1, 2012)

("The [statute] does not expressly create a private cause of action against an employer who adopts the drug-free workplace program but then fails to follow its own procedures.").

And, while Section 440.101 does not expressly set forth any private cause of action, significantly, Section 112.0455 does. *See* Fla. Stat. § 112.0455(15) ("(a) Any person alleging a violation of the provisions of this section . . . must institute a civil action for injunctive relief or damages, or both, in a court of competent jurisdiction within 180 days of the alleged violation, or be barred from obtaining . . . relief"). Had the legislature intended to create a private cause of action under the optional drug-free workplace program, it obviously knew how to do so. Absent an explicit expression of legislative intent, the Court will not imply a private right of action. Because the Court finds that § 440.102 does not create a private right of action, Count VIII of Hudson's Amended Complaint is dismissed with prejudice.

### C.  Qualified Immunity

In light of the Court's determination that Hudson has stated a cognizable claim under the Fourth Amendment, the Court must decide whether Perry is entitled to assert a defense of qualified immunity. Qualified immunity protects government officials who perform discretionary functions by shielding them from civil liability as long as the officials' conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This doctrine protects "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). It applies "regardless of whether the government official's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

-40-

Not only does qualified immunity provide protection from liability, but it also endows officials with protection from suit. *Lee*, 284 F.3d at 1194 (citation omitted). Therefore, a court must ascertain the validity of a qualified-immunity defense "as early in the lawsuit as possible." *Id.*

To obtain qualified immunity, a defendant must establish that he was acting within her discretionary authority when the alleged violation occurred. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). If the defendant satisfies this requirement, the plaintiff must demonstrate that qualified immunity is inappropriate. *Id.* To determine whether qualified immunity exists, a court must evaluate (1) whether a plaintiff has alleged a violation of a constitutional right and (2) whether the right at issue was clearly established at the time of the official's conduct. *See, e.g.*, *Randall v. Scott*, 610 F.3d 701, 715 (11th Cir. 2010). Courts may consider these issues in any order. *Powell v. Sheriff, Fulton Cnty., Ga.*, 511 F. App'x 957, 960 (11th Cir. 2013) (citing *Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S. Ct. 2074 (2011)). The failure to satisfy either prong requires denial of qualified immunity.

Perry maintains that she was acting within her discretionary authority at the time of the alleged violation because, as the City's Human Resources Director, she was acting in a supervisory fashion in administering the City's drug-testing policy and she was exercising her discretion in determining the employees chosen to be drug-tested pursuant to that policy. This Court disagrees.

To determine whether an official was performing a discretionary duty, the court must consider two issues: (1) whether the official was performing a legitimate job-related function and (2) whether the official conducted that function through means that were within her power to utilize. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Although Perry was a supervisor at the time that she ordered that Hudson be drug-tested, and ordering drug testing fell

within Perry's job responsibilities, the Amended Complaint asserts that Perry had Hudson drug-tested for reasons entirely unrelated to her duties at the City.  If these allegations are true, Perry was not performing a legitimate job-related function when she ordered that Hudson be tested, and it was not within her power to order the testing for personal reasons.

But even if Perry had been acting within her discretionary authority, under the allegations of the Amended Complaint, Perry's actions violated clearly established law.  To determine whether a right was clearly established at the time of the alleged violation, the court must consider "whether it would be *clear* to a reasonable [city official] that [her] conduct was unlawful in the situation [she] confronted."  *Leslie v. Hancock Cnty. Bd. of Educ.* 720 F.3d 1338, 1345 (11th Cir. 2013) (citation and quotation marks omitted) (emphasis in original).  This, in turn, requires the court to examine the law as decided by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida.  *See id.* (citation omitted).  "[T]he salient question . . . is whether the state of the law . . . gave [the official] *fair warning* that [her] alleged treatment of [Hudson] was unconstitutional."  *Id.* (citation and quotation marks omitted) (emphasis in original).

A right may be clearly established in three different ways: (1) the case under review shares facts with "materially similar" precedent; (2) a "broader, clearly established principle . . . control[s] the novel facts [of the] situation"; or (3) the conduct "so obviously violate[s] [] th[e] [C]onstitution that prior case law is unnecessary."  *Id.* at 1345-46 (citations and quotation marks omitted).

The Supreme Court has repeatedly reiterated that, absent rare and limited circumstances not pertinent here, the Fourth Amendment requires that a search be supported by individualized suspicion.  *See, e.g.*, *Chandler*, 520 U.S. at 308 ("[The Fourth Amendment's] restrained on government generally bars officials from undertaking a search or seizure absent individualized

suspicion."); *Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) ("A search or seizure is ordinarily

unreasonable in the absence of individualized suspicion of wrongdoing."); *United States v. Martinez-*

*Fuerte*, 428 U.S. 543, 560 ("[S]ome quantum of individualized suspicion is usually a prerequisite

to a constitutional search or seizure."). While the Constitution imposes no "irreducible" measure

of such suspicion, some level of suspicion is nonetheless required, and the Supreme Court has

"recognized only limited circumstances in which the usual rule does not apply." *Edmond*, 531 U.S.

at 37. These recognized exceptions are predicated on certain "special needs," in which the

government's interest in undertaking the suspicionless search is particularly high. *See Skinner*, 489

U.S. at 624 ("In limited circumstances, where the privacy interests implicated by the search are

minimal, and where an important governmental interest furthered by the intrusion would be placed

in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the

absence of such suspicion."). The Supreme Court has emphasized, however, that such a special need

in the context of drug-testing must be "substantial" and "sufficiently vital" to overcome the

individual's acknowledged privacy interest. *Chandler*, 520 U.S. at 318.

With respect to drug-testing of public employees, the Supreme Court has authorized random,

suspicionless searches only where the nature of the individual's employment implicated public

safety. *See, e.g.*, *Skinner*, 489 U.S. at 602 (railway employees engaged in safety-sensitive tasks); *Von*

*Raab*, 489 U.S. at 656 (customs employees who carry firearms and are concerned with the

interdiction of controlled substances). But where public safety is not "genuinely in jeopardy," the

Fourth Amendment precludes suspicionless searches. *Chandler*, 520 U.S. at 323.

According to the Amended Complaint, Perry lacked any suspicion whatsoever to drug-test

him and instead did it to exact vengeance on Hudson. This is in no way related to any public safety

measure or other recognized government interest supporting a suspicionless search.  In the absence

of any suspicion at all, such a personal and abusive use of the government's power to conduct drug-

testing so obviously violates Fourth Amendment rights that no case law stating this proposition was

necessary to have put Perry on notice of its unconstitutionality.[10]  For this reason, the Court denies

Perry's qualified-immunity defense at this time.

## V.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** and **ADJUDGED** that Defendants'

Motion to Dismiss Plaintiff's Amended Complaint [D.E. 29] is hereby **GRANTED IN PART AND**

**DENIED IN PART** as follows:

1.     Counts I through V and Count VII as they relate to Defendant City are **DISMISSED**

**WITHOUT PREJUDICE**, except to the extent that Counts III through V raise

substantive-due-process claims against Defendant City, which are **DISMISSED**

**WITH PREJUDICE**;

2.     Count III's Fourteenth Amendment procedural-due-process claim against Defendant

Perry is **DISMISSED WITHOUT PREJUDICE,** and Count III's Fourteenth

Amendment substantive-due-process claim against Defendant Perry is **DISMISSED**

**WITH PREJUDICE**;

---

[10]*Walker v. Darby*, 911 F.2d 1573 n.8 (11th Cir. 1990), arguably suggests that intercepting an employee's conversations, and, thus, conducting a search, simply because of a vendetta against the employee violates the employee's Fourth Amendment rights, although the case was decided under the anti-wiretap statute, 18 U.S.C. §§ 2510, *et seq.*

3.      Defendant's Motion to Dismiss is **DENIED** with respect to Count III's Fourth Amendment claim against Defendant Perry;

4.      Count IV's Fourteenth Amendment procedural-due-process claim against Defendant Shuttlesworth is **DISMISSED WITHOUT PREJUDICE,** and Count IV's Fourteenth Amendment substantive-due-process claim against Defendant Shuttlesworth is **DISMISSED WITH PREJUDICE**;

5.      Count V's Fourteenth Amendment procedural-due-process claim against Defendant Shuttlesworth is **DISMISSED WITHOUT PREJUDICE,** and Count V's Fourteenth Amendment substantive-due-process claim against Defendant Shuttlesworth is **DISMISSED WITH PREJUDICE**;

6.      Count VI against Defendants Shuttlesworth and the City are **DISMISSED WITH PREJUDICE**;

7.      Count VII's Fourteenth Amendment procedural-due-process claim against Defendant White is **DISMISSED WITHOUT PREJUDICE,** and Count VII's Fourteenth Amendment substantive-due-process claim against Defendant White is **DISMISSED WITH PREJUDICE**;

8.      Count VIII against all Defendants is **DISMISSED WITH PREJUDICE**.

9.      Plaintiff shall have until November 27, 2013, to replead any claims dismissed

without prejudice, should he wish to do so.

**DONE** and **ORDERED** in Fort Lauderdale, Florida, this 13th day of November 2013.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies:

Counsel of record

Michael Hudson, *pro se*
180 N.E. 123rd Street
Miami, Florida 33161