# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-80870-CIV-ROSENBAUM/HUNT

MICHAEL A. HUDSON,

        Plaintiff,

v.

CITY OF RIVIERA BEACH, GLORIA
SHUTTLESWORTH, and DORETHA PERRY,

        Defendants.

_____/

## ORDER ON MOTION TO DISMISS

This matter is before the Court upon Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint [ECF No. 78]. The Court has considered the Motion, the parties' briefs, and the Second Amended Complaint and is otherwise fully advised in this matter. For the reasons explained below, the Court grants in part and denies in part Defendants' Motion to Dismiss.

### *I. Factual Background*[1]

The thrust of the instant action stems from Plaintiff Michael Hudson's contention that City of Riviera Beach employee Defendant Doretha Perry used her position of power with the City to force Hudson, a City employee, to take a drug test for no reason other than a personal vendetta against him. This vendetta, Hudson claims, arose out of Hudson's relationship with Defendant Perry's son, Troy Perry ("Troy").

---

[1] The information contained in this section comes from Plaintiff's Second Amended Complaint. On a motion to dismiss, the Court accepts the non-conclusory allegations as true and views them in the light most favorable to the plaintiff. *See, e.g.*, *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011).

Hudson, who was a multi-media specialist for the City of Riviera Beach's government-access television station, had an argument with Troy shortly after Hudson began working for the City.  ECF No. 66 at ¶¶ 2, 23. The Second Amended Complaint contends that Troy, who was serving as the City's fire chief, tried to have Hudson reprimanded as a result of Hudson's disagreement with Troy, but he was unsuccessful. *Id.* at ¶ 2.  As the Second Amended Complaint explains events, Troy's failure to have Hudson reprimanded exacerbated Troy's anger with Hudson and caused Troy to threaten, "[T]his is not over." *Id.*

During a subsequent upheaval in the City, the City Manager was forced to resign, and Troy "was named and or given the duties of Interim Assistant City [Manager]." *Id.* at ¶ 1.  In his interim position and true to his word, the Second Amended Complaint suggests, Troy apparently enlisted the assistance of his mother, Perry, to even the score with Hudson.  *See id.* at ¶¶ 1-3.

Perry, who was the Human Resources Director of the City at the time, arranged on February 3, 2009, for Hudson to be required to submit to three different types of drug tests.  *See id.* at ¶ 26. She did this, the Second Amended Complaint asserts, even though she was not Hudson's supervisor, Hudson's supervisor neither requested the drug test nor suspected Hudson of using drugs, Hudson had consistently received "excellent" evaluations and had never been reprimanded or disciplined in his four years of employment with the City, and Hudson did not work in a safety-sensitive position or perform safety-sensitive functions. *Id.* at ¶¶ 24, 30, 33.

The Second Amended Complaint further avers that Hudson was advised that if he refused to take the drug tests, he would be fired.  *Id.* at ¶ 29. When Hudson asked why he was being required to submit to drug testing, the City's risk manager responded that the test was based on "reasonable suspicion," although he did not know what the reasonable suspicion supporting the test was. *Id.* at

¶ 28.  According to the Second Amended Complaint, the risk manager told Hudson that he did not know why the test was ordered, only that Perry had ordered the drug tests and that it was his job to take Hudson to be tested. *Id.*

Therefore, on February 4, 2009, the Second Amended Complaint asserts, Hudson reluctantly took a Breathalyzer test, a urine test, and a hair-sample test. *Id.* at ¶ 8.[2]  After complying with the drug-test directive, Hudson asked Perry what the reasonable suspicion was for the testing and requested that Perry provide him with any records supporting reasonable suspicion. *Id.* at ¶ 10.[3]  The Second Amended Complaint claims that Perry "smirked" and retorted, "It does not work like that[.] I don't have to give you anything. [T]here are no records[.]" *Id.*  When Hudson responded by showing Perry the Florida Drug Free Work Place Act, the Second Amended Complaint avers, Perry taunted, "[I]f I did break the law[,] what are you gonna do about it?" *Id.*  Hudson continued to press Perry to provide an explanation for her decision to order the drug test, but Perry provided none. *Id.* Eventually, Perry told Hudson that she would give him a report if he returned with a records request. *Id.*

The next day, Perry provided Hudson with a one-paragraph explanation for why she ordered the drug testing.  *See id.* at ¶ 10.[4]  The paragraph stated that Perry had "received several verbal

---

[2] Some of the paragraphs in the Second Amended Complaint appear to be misnumbered. Although labeled as paragraph "8," this paragraph follows paragraph 29 on page 8 of the Second Amended Complaint.  To avoid confusion, the Court will cite to the paragraphs as numbered but will indicate which ones are numbered incorrectly.

[3] This citation refers to paragraph 10 on page 8 of the Second Amended Complaint.  *See supra* note 2.

[4] This citation refers to paragraph 10 on page 8 of the Second Amended Complaint.  *See supra* note 2.

complaints from employees the latest being on January 29, 2009, stating that [Hudson's] eyes were glassy and [he] smelled like marijuana." *Id.* According to Hudson, Perry did not corroborate this tip, did not ask not question the alleged informant for any particular details, and did nothing to investigate the accusation. *Id.* Moreover, the report did not identify which employees had allegedly complained about Hudson, and Perry later stated under oath that she did not recall who had complained. *See id.* at ¶ 73.

Apparently, Perry later changed her story, testifying during a deposition in 2010 that she had received the tip from an employee who had heard the information from another employee. *Id.* at ¶ 69. Perry did not inform Hudson's immediate supervisor, Carrie E. Ward, that she had received complaints about Hudson. *Id.* at ¶¶ 33-34. According to Hudson, Perry admitted to testing employees based on her gut feelings and stated that she had been doing so for years. *Id.* at ¶ 9.[5]

Hudson also avers that he repeatedly complained to then-Interim City Manager Gloria Shuttlesworth of his grievance regarding the drug testing. *See id.* at ¶ 47. But despite Shuttlesworth's knowledge of the situation, Hudson asserts, Shuttlesworth failed to intervene or investigate the matter. *Id.*

In the meantime, Hudson's urine test returned negative results. *See id.* at 46. Hudson subsequently contacted Concentra, who had administered the drug testing, and advised the company of the circumstances surrounding Hudson's drug testing. *Id.* at 63. Concentra then informed Hudson that he had a right to revoke the rights of the test under the Health Insurance Portability and Accountability Act, to the extent that the results had not yet been returned. *Id.* Upon learning this

---

[5] This citation refers to paragraph 9 on page 11 of the Second Amended Complaint. *See supra* note 2.

information, Hudson submitted a letter to Concentra revoking the rights to his protected health information until all administrative or legal matters were resolved. *Id.* Therefore, the results of the hair-sample test were not provided to the City. *Id.*

As noted above, Hudson's employment was governed by a collective-bargaining agreement[6] entered into between the City and the Florida Public Service Union and the Service Employee International Union (the "Agreement"). *Id.* at 90. Article 29 of the Agreement outlines the City's Drug-Free Workplace Policy, which was implemented pursuant to § 440.102, Fla. Stat.[7] *Id.* at 91. The policy states, in relevant part, that an employee may be drug tested when reasonable suspicion exists that an employee is using or has used drugs or alcohol. *Id.*

In March 2009, Hudson was suspended from work. *Id.* at 46. In the suspension letter, the City stated that Hudson's revocation of the hair-sample test was tantamount to a refusal to take the test. *Id.* The City's drug policy provides that "any employee who refuses to submit to a drug test may be terminated from employment." *Id.* Therefore, the City asserted, Plaintiff's refusal to release the results of his test was a violation of his employment contract and grounds for suspension. *Id.*

An administrative hearing took place in late April 2009 regarding whether Hudson should be terminated. *Id.* at ¶ 37. The Second Amended Complaint contends that the hearing was

---

[6] As a general rule, courts may consider only matters within the four corners of the complaint in deciding a motion to dismiss. Where, however, the plaintiff "refers to certain documents in the complaint and those documents are central to the plaintiff's claim, the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6)." *Brooks v. Blue Cross & Blue Shield of Fla.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Here, Plaintiff repeatedly refers to the Agreement and has attached a copy to his Second Amended Complaint.

[7] In actuality, the agreement cites to § 440.201, Fla. Stat., but this section does not exist within the Florida Statutes. The policy apparently intended to refer to § 440.102, Fla. Stat., which details the Florida Drug-free workplace program requirements.

inadequate because Perry, Hudson's initial accuser, was not present, and Hudson was not given an opportunity to cross-examine any witnesses.  *Id.* at ¶¶ 38-39.  In addition, the Second Amended Complaint avers, Defendants did not provide Hudson with certain requested documentation until after the hearing had already occurred.  *Id.* at ¶ 44.  Following the hearing, the City terminated Hudson's employment.

After his discharge, Hudson requested an appeal before the Civil Service Board.  *Id.* at ¶ 53. At the time of Hudson's request, no Civil Service Board existed, and it took the City of Riviera Beach more than six months to assemble one.  *Id.* at ¶ 54.  Hudson alleges that the City then allowed Perry to select the Board's hearing officer, who turned out to be a personal friend of hers.  *Id.* at ¶ 55.  In addition, the City did not make Defendants available for deposition until a year-and-a-half later.  *Id.* at ¶ 56.  Then, the Second Amended Complaint contends, the City ceased contact with Hudson.  *Id.* at ¶ 57.  Hudson alleges that a hearing before the Civil Service Board never took place and that he was provided a pre-termination hearing only.  *Id.* at ¶ 63.  As a result of his termination, Hudson claims that he has been unable to reestablish his career in public television.  *Id.* at ¶ 62.

## II.  *Procedural Background*

The Court partially dismissed Hudson's First Amended Complaint but granted Hudson leave to amend those claims that the Court deemed insufficient.  Hudson subsequently filed a Second Amended Complaint asserting three Counts against the City of Riviera Beach, Perry, and Shuttlesworth, respectively.  In particular, Hudson asserts claims under 42 U.S.C. § 1983, alleging that all three Defendants violated his civil rights under the Fourth and Fourteenth Amendments because the drug testing constituted an unlawful search and seizure and a violation of due process.

### III.  Legal Standard

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").  Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)).  The Supreme Court has emphasized that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).

When reviewing a motion to dismiss, a court must limit its consideration to the pleadings and exhibits attached to the pleadings and, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000).  Upon engaging in this analysis, a court should deny a motion to dismiss where the pleading asserts non-conclusory, factual allegations, that, if true, would push the claim "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570) (quotation marks omitted); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570) (explaining that allegations in a

complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'").  A claim is facially plausible when the plaintiff's factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

## *IV.  Discussion*

### A.  Municipal Liability Under Section 1983

In its previous Order, the Court dismissed Hudson's claims against the City of Riviera Beach because Hudson had failed to state a claim for municipal liability under § 1983.  Although Plaintiff has amended his Complaint to cure this deficiency, the amended factual allegations are still insufficient to impose liability against the City.

Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, creates a cause of action against any person acting "under color of any statute, ordinance, regulation, custom, or usage of an State or Territory or the District of Columbia, [who] subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  To state a claim for relief under § 1983, a plaintiff must establish that (1) he has been deprived of a right, privilege, or immunity secured by the Constitution and (2) he was so deprived under the auspices of governmental authority.  *See Griffin v. City of Opa Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).

The Supreme Court has held that municipalities may be liable for violations of § 1983, but this liability is limited.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).  Municipalities may be sued only for their own unconstitutional or illegal policies; they may not be sued for the acts of their employees.  *Id.* at 691.  As a result, a claim against a municipality under § 1983 must be

predicated upon an injury inflicted by governmental policy or custom constituting "official policy." *Id.* at 694.

The existence of a policy or custom sufficient to impose § 1983 liability on a municipal government can be established in several ways. For example, official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. *Connick v. Thompson*, __U.S.__, __, 131 S. Ct. 1350, 1359 (2011). A plaintiff can also demonstrate official policy by showing a government policy of inadequate training or supervision. *See City of Okla. City v. Tuttle*, 471 U.S. 808 (1985). In this regard, the municipality is deemed liable for its deliberate indifference to the rights of those affected by its policy of inadequate training. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Here, Hudson's claims against the City are grounded in his assertion that (1) the City's drug policy is unconstitutionally vague and (2) the decision to drug test Hudson constituted City policy because Perry was a "final decisionmaker."[8] But the factual allegations in the Second Amended Complaint still fail to sufficiently plead facts establishing the applicability of either of these theories of liability.

### 1. The Drug Policy as the City's "Official Policy"

Hudson appears to predicate liability for the City based on his assertion that the drug policy itself is unconstitutionally vague. In particular, Hudson contends that the policy does not adequately

---

[8] Although Hudson previously sought to establish municipal liability based on a failure-to-train theory and appears to include language to that effect in his Second Amended Complaint, Hudson expressly states in his Response brief that he is "not trying to establish a claim based on a failure to train." ECF No. 93 at 8. Accordingly, the Court does not address that claim here.

define "reasonable suspicion" and lacks procedural safeguards to protect employees from the arbitrary decisions of their superiors.

An enactment is void for vagueness if it fails to give a person of ordinary intelligence "a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 109 (1972).  It may also be unconstitutionally vague if it lacks standards that are "sufficient to guard against the arbitrary deprivation of liberty." *City of Chicago v. Morales*, 570 U.S. 41, 52 (1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)); *see also Grayned*, 408 U.S. at 108 ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.").  While some standard is necessary, neither "mathematical certainty" nor "meticulous specificity" is required.  *See Grayned*, 408 U.S. at 110.

Here, the term "reasonable suspicion" is not properly subject to a vagueness challenge. Although no textbook definition for "reasonable suspicion" exists and the term is both flexible and context-specific,  *see Ornelas v. United States*, 517 U.S. 690, 695 (1996) ("Articulating precisely what 'reasonable suspicion' . . . mean[s] is not possible."), the term has a long and well-established history in Fourth Amendment jurisprudence and provides sufficiently articulable guidelines to be applied in the context of a search.  In particular, reasonable suspicion requires "something more than an inchoate and unparticularized suspicion or hunch," and "some minimum level of objective justification is required." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation and internal quotation marks omitted); *see also Bailey v. City of Baytown, Tex.*, 781 F. Supp. 1210, 1215 (S.D. Tex. 1991) ("[R]easonable suspicion exists when there is some articulable basis for suspecting that the employee is using illegal drugs."); *Fowler v. New York City Dep't of Sanitation* 704 F. Supp. 1264, 1272 (S.D.N.Y. 1989) ("'[R]easonable suspicion' . . . has been defined as that quantum of

evidence sufficient to support a belief that the individual used drugs.").   While admittedly nontechnical, "reasonable suspicion" is "no less precise than the myriad of other legal terms that have withstood void-for-vagueness challenges."  *Doyon v. Home Depot U.S.A., Inc.*, 850 F. Supp. 125, 131 (D. Conn. 1994); *see, e.g.*, *Thomas v. Chichago Park Dist.*, 227 F.3d 921, 925 (7th Cir. 2000) (holding that the term "material," which is "one of the elemental legal terms" is not vague); *ACLU v. Gonzales*, 237 F.R.D. 120, 130 (E.D. Pa. 2006) ("[T]he word 'residents' is not vague or ambiguous as this is a readily definable legal term with a long precedential history.").  Thus, on its face, the term withstands constitutional scrutiny.

Moreover, contrary to Hudson's assertion, the City's drug policy does contain a definition for "reasonable suspicion."  As previously noted, the drug policy was specifically adopted pursuant to § 440.102, Fla. Stat., which contains Florida's Drug-Free Workplace Program requirements.  The statute, in turn, provides the following definition:

> "Reasonable-suspicion drug testing" means drug testing based on a belief that an employee is using or has used drugs in violation of the employer's policy drawn from specific objective and articulable facts and reasonable inferences drawn from those facts in light of experience. Among other things, such facts and inferences may be based upon:
>
> 1. Observable phenomena while at work, such as direct observation of drug use or of the physical symptoms or manifestations of being under the influence of a drug.
>
> 2. Abnormal conduct or erratic behavior while at work or a significant deterioration in work performance.
>
> 3. A report of drug use, provided by a reliable and credible source.
>
> 4. Evidence that an individual has tampered with a drug test during his or her employment with the current employer.

> 5. Information that an employee has caused, contributed to, or been involved in an accident while at work.
>
> 6. Evidence that an employee has used, possessed, sold, solicited, or transferred drugs while working or while on the employer's premises or while operating the employer's vehicle, machinery, or equipment.

Fla. Stat. § 440.102(n).  Thus, despite Hudson's assertion, the City's policy explicitly incorporates the standard that City employees must use in order to prescribe drug-testing based upon reasonable suspicion.

Although Hudson attempts to challenge the policy itself, it is evident that Hudson's claims primarily stem from the fact that the individual Defendants purportedly did not comply with the drug policy's reasonable-suspicion requirement in ordering that Hudson be tested.  But Defendants' failure to abide by the policy provides no basis for establishing liability against the City, as this would amount to nothing more than a *respondeat superior* theory of liability, which the Supreme Court expressly rejected in *Monell*.  Since the factual allegations in the Second Amended Complaint fail to show that the drug policy itself was unconstitutional, the Court declines to impose liability on the City on this basis.

### 2.  Official Policy by Individual with Final Decisionmaking Authority

Hudson also contends that the decision to drug test him constituted an "official policy" for which Perry was the final decisionmaker.  In appropriate circumstances, a single action taken by a local official may give rise to municipal liability.  "If the decision to adopt [a] particular course of action is properly made by [the] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  The Supreme Court has emphatically noted, however, that not every decision by municipal officers will automatically subject the municipality to § 1983

-12-

liability.  Rather, "municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Id.*  An official's discretion to undertake certain functions, alone, is not sufficient to impose liability on the municipality based on the exercise of that discretion.  *Id.*  The official must also be responsible for establishing "final government policy."  *Id.*

Here, Hudson asserts that Perry was the "final decisionmaker" in ordering Hudson to submit to the drug test.  Although the Second Amended Complaint alleges that Perry made the decision to drug test Hudson, the allegations do not support the contention that Perry was responsible for establishing *final* City policy with respect to drug-testing procedures.  Rather, Hudson merely asserts that it was customary practice for the City to delegate the authority to "administer and implement the City's Drug Policy to Department Heads and Supervisors."  ECF No. 93 at 6.  While Perry certainly had authority to *implement* the policy as to her subordinates, nothing in the Second Amended Complaint indicates that Perry was responsible for *establishing* the policy.  Indeed, Hudson states that the union contract, which incorporated the drug policy, was "approved by the City Council."  ECF No. 66 at ¶ 16.

As the Court noted in its previous Order, Perry's directive was ultimately limited to compliance with the City's drug policy.  But crux of the Second Amended Complaint is that Perry failed to abide by that policy.  Therefore, the allegations in the Second Amended Complaint contain no basis to conclude that Perry somehow established "final" City policy in making a decision under an already-existing policy.  Accordingly, municipal liability is not warranted on these grounds.  The very purpose of the "official policy" requirement is to distinguish acts of the municipality from acts of employees of the municipality "and thereby make clear that municipal liability is limited to action

for which the municipality is actually responsible." *Pembaur*, 475 U.S. 479.  To hold the City liable for Perry's actions would run contrary to this mandate.  Accordingly, Count I of the Second Amended Complaint is dismissed.

**B.  Liability of Individual Defendants**

The Court now turns to the claims against the individual Defendants.  In alleging a claim under § 1983, Hudson asserts deprivations of his federal rights under the Fourteenth and  Fourth Amendments.  The Court addresses these claims in turn.

**1.  Fourteenth Amendment Procedural-Due-Process Claims**

The Court previously dismissed Hudson's Fourteenth Amendment procedural-due-process claims because, although Hudson had properly alleged a cognizable property interest in his continued employment with the City, Hudson had not demonstrated the inadequacy of his state remedies.  *See* ECF No. 60 at 18.  In particular, the Court noted that "no state procedural-due-process violation can occur unless and until the state has had every procedural opportunity to remedy an alleged deprivation of a protected interests."  *Id.* at 21.  Because Hudson failed to plead that he attempted to obtain relief from Florida courts, the Court dismissed his procedural-due-process claims but permitted him to replead those Counts "if he has sought state-court review and asserts that the state courts have also denied him procedural due process."  *Id.* at 21.

Defendants move to dismiss Hudson's Fourteenth Amendment claims because the Second Amended Complaint does not allege that Hudson sought state-court review.  In response, Hudson states that his Fourteenth Amendment claims "do not revolve around the fact that Hudson lost his property right in his employment rather Hudson alleges that his fundamental Fourth Amendment right to be free was taken away because the City did not follow procedural due process guidelines

-14-

before ordering him to take drug test." ECF No. 93 at 9. Thus, rather than contesting the constitutional adequacy of his pre- and post-termination hearings, Hudson's due-process claims challenge the constitutionality of the drug test itself. Because the lawfulness of the search requires an analysis under the Fourth Amendment, the Court addresses this claim below.

### 2. Fourth Amendment Claim

In his Second Amended Complaint, Hudson asserts that the drug testing constituted an unreasonable search and seizure in violation of the Fourth Amendment. In its previous Order, the Court delved into a lengthy analysis of Hudson's allegations in this regard and concluded that a sufficient factual basis existed to allow Hudson's claim to proceed. In particular, the Court noted that the facts in the Amended Complaint supported Hudson's assertions that Perry lacked any suspicion whatsoever in ordering the drug test, which, if true, violates the Fourth Amendment's requirement that searches be based upon some level of individualized suspicion. Defendants again move to dismiss Hudson's Fourth Amendment claims, but this time they argue that the additional allegations and documents included in the Second Amended Complaint demonstrate that Perry had a foundation to form reasonable suspicion. Upon review of the Second Amended Complaint and its attachments, however, the Court finds that Hudson still states a cause of action under the Fourth Amendment.

The Fourth Amendment protects individuals from unreasonable searches conducted by the government. It is well settled that the Fourth Amendment's protection "extends beyond the sphere of criminal investigations," "without regard to whether the government actor is investigating crime or performing another function." *City of Ontario v. Quon*, 560 U.S. 746, 755-56 (2010). Thus, the

Fourth Amendment applies "even when the government acts as an employer." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989).

Here, as before, the parties do not dispute that the drug test constituted a search within the meaning of the Fourth Amendment. Thus, the Court must consider whether the Second Amended Complaint asserts sufficient allegations to establish the plausibility of Hudson's claim that the search was not reasonable. Generally, in order for a search to be reasonable, it must be based on individualized suspicion of wrongdoing. *Chandler v. Miller*, 520 U.S. 305, 314 (1997). Although no fixed threshold of suspicion is required, in the context of government employment, intrusions on the protected privacy interests of government employees for non-investigatory, work-related purposes, as well as for investigations of work-related misconduct are judged by an amorphous standard of reasonableness. *See O'Connor v. Ortega*, 480 U.S. 709, 726 (1987) (plurality opinion); *see also Everett v. Napper*, 833 F.2d 1507, 1511 (11th Cir. 1987). In determining the reasonableness of a search in this area, the Court evaluates whether the search was justified at its inception and whether the search was reasonable in scope. *Everett*, 833 F.2d at 1511. This determination requires a balancing of the employee's privacy interests against the government's need for supervision, control, and efficient operation of the workplace. *O'Connor*, 480 U.S. at 719.

The Second Amended Complaint sets forth virtually the same facts as Hudson's prior pleading. In particular, the Second Amended Complaint alleges that Perry ordered Hudson to submit to drug-testing based on "several verbal complaints from employees" who claimed that Hudson's "eyes were glassy" and that he "smelled like marijuana." ECF No. 66 at ¶ 10.[9] Hudson avers,

---

[9] This citation refers to paragraph 10 on page 10 of the Second Amended Complaint. *See supra* note 2.

however, that Perry could not subsequently remember who her anonymous source was.  *See id.* at ¶ 73.  In essence, Hudson suggests that Perry fabricated a basis for the drug test and that, in fact, she had no reasonable basis to require it.  Indeed, Hudson contends that Perry admitted to drug-testing employees based on her gut feelings.  *Id.* at ¶ 9.[10]  Hudson also claims that Perry never personally corroborated any of the allegations from her purported sources.  *Id.* at ¶ 10.[11]

Even more significantly, however, the Second Amended Complaint alleges that Perry's decision was motivated by personal animosity.  Hudson avers that he and Perry's son Troy had a disagreement shortly after Plaintiff was hired and that Troy subsequently sought to have Plaintiff reprimanded.  *Id.* at ¶ 2.  When those efforts failed, Hudson claims, Troy cautioned that the situation was "not over."  *Id.*  Shortly after the change in the City's management, Hudson was ordered to undergo the drug test.  *Id.*  Thus, Hudson contends that Perry's intentions in ordering the drug test were in fact malicious.  Hudson further supports this contention with the allegations that Perry was not Hudson's direct supervisor and that Perry did not consult with Hudson's supervisor before issuing her order.

As the Court previously concluded, these allegations plausibly lend themselves to a conclusion that the drug test was unreasonable from its inception, and Defendants' current attempts to dispute Hudson's allegations in this regard are unavailing.  In support of their position, Defendants cite to Perry's report—which states that she based her decision on tips from anonymous sources—as evidence that the search was reasonable.  But the fact that Perry supposedly relied on complaints

---

[10] This citation refers to paragraph 9 on page 11 of the Second Amended Complaint.  *See supra* note 2.

[11] This citation refers to paragraph 10 on page 10 of the Second Amended Complaint.  *See supra* note 2.

from employees is not a new allegation and was expressly addressed in the Court's previous Order. As in his last pleading, Hudson again contends that although Perry justified the search by stating that she received complaints from employees, Perry in fact concocted the story, and no reasonable basis existed for the search.  Hudson bases this contention on the fact that Perry could not later remember who her anonymous source was, Perry never attempted to corroborate the information that she was purportedly given, and Perry admitted that she frequently ordered drug tests based on only a hunch. These allegations, coupled with Hudson's assertion that Perry had a personal vendetta against him and his suggestion that Perry ordered the drug test only to get even with Hudson, are sufficient to state a claim for unlawful search.

Hudson's additional allegation that Perry later identified her anonymous sources does not alter this conclusion.  Defendants claim that Perry's report is implicitly corroborated by the fact that during a deposition in 2010, Perry stated that she received the tip from two of her employees, Cassandra Wooten and Eureka Irwin.  According to Hudson, Perry stated during a deposition that "Cassandra Wooten told Eureka Irwin and Eureka Irwin told . . . Perry."  ECF No. 66 at ¶ 69.  But this contention does not detract from Hudson's allegations that the search was unjustified.

At the outset, the deposition testimony contradicts Perry's earlier insistence that she could not remember who her anonymous source was.  Moreover, even if Perry's testimony is true, that indicates only that Perry relied on a tip from a person who had no firsthand knowledge of the events giving rise to the accusation.  Indeed, Hudson reiterates that Perry never asked Irwin "any details to corroborate the hearsay that Cassandra told Eureka," but merely "took Eureka at her word."  *Id.* Contrary to Defendants' contention, the Second Amended Complaint does not show that there were "multiple, contemporaneous, and detailed employee complaints."  ECF No. 78 at 8.  Rather, the

factual allegations indicate only that Perry may have relied on the sparse, secondhand information of an employee without investigating or corroborating the employee's claims. This only lends credence to Hudson's assertions.

Finally, Defendants appear to argue that reasonable suspicion existed for the search because a neutral Human Resources administrator and the Assistant City Attorney determined that reasonable suspicion existed at the conclusion of Hudson's pre-termination hearing. This independent finding, Defendants assert, "cements the fact that reasonable suspicion existed." ECF No. 78 at 8.[12]

The Court rejects this argument outright. The mere fact that the Assistant City Attorney concluded that the verbal complaints were enough to give rise to reasonable suspicion does not displace this Court's independent obligation to determine the constitutional issues raised in this action. Indeed, as discussed at length in the previous Order, any factual finding made by the City during the grievance process does not preclude the Court from consideration of the same factual issue anew, especially in light of Hudson's allegations that the proceedings were biased and procedurally inadequate. *See* ECF No. 60 at 24-32. Hudson has sufficiently stated a claim against Perry under the Fourth Amendment, so Defendants' Motion to Dismiss is denied as to Count II.

The Court agrees with Defendants, however, that Hudson's claims against Shuttlesworth remain deficient. The Court previously dismissed the claims against Shuttlesworth without prejudice, noting that the "allegations in the Amended Complaint do not make it possible to assess

---

[12] In their previous Motion to Dismiss, Defendants argued that Plaintiff's Fourth Amendment claims were legally precluded because the issue of "reasonable suspicion" was decided during the grievance process—a contention that the Court ultimately rejected. Here, however, Defendants seem to argue simply that a "neutral" determination lends factual support for their assertion that reasonable suspicion existed to order the drug test.

whether Shuttlesworth knowingly violated Hudson's Fourth Amendment rights." ECF No. 60 at 35-36.  The Second Amended Complaint fares no better.

According to Hudson, Shuttlesworth "knew of Perry's intent to drug test [him]" and "fail[ed] to intervene and make sure that Perry act[ed] lawfully."  ECF No. 66 at ¶ 46.  Hudson further avers that Shuttlesworth did not probe Perry on the details regarding Perry's decision and purportedly stated that she "really didn't think much of it."  *Id.*  But this fact, alone, is insufficient to state a claim under § 1983.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith*, 781 F.2d 319,  323 (2d Cir. 1986).  To state a claim under § 1983, the defendant must have directly participated in the alleged constitutional deprivation; mere supervisory authority is insufficient.  *See Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003).

Here, although Hudson generally alleges that Shuttlesworth knew of Perry's decision to drug test him, he does not explain the extent of her knowledge or involvement.  As a result, the factual allegations do not sufficiently indicate whether Shuttlesworth somehow acquiesced in or condoned any purportedly unconstitutional conduct that would justify the imposition of liability.  *See, e.g.*, *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988) ("[S]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.").  Moreover, the majority of Hudson's allegations against Shuttlesworth center around her failure to remedy the situation *after* the drug test had already been administered.  Her involvement in the

allegedly unlawful search remains unclear.   Accordingly, Count III of the Second Amended Complaint is dismissed.

### C.  Qualified Immunity

In light of the Court's determination that Hudson has stated a cognizable claim under the Fourth Amendment, the Court must decide whether Perry is entitled to assert a defense of qualified immunity.  For the same reasons discussed in the Court's previous Order, the Court again denies Perry's claim of qualified immunity.

Qualified immunity protects government officials who perform discretionary functions by shielding them from civil liability as long as the officials' conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This doctrine protects "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  It applies "regardless of whether the government official's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Not only does qualified immunity provide protection from liability, but it also endows officials with protection from suit. *Lee*, 284 F.3d at 1194 (citation omitted).  Therefore, a court must ascertain the validity of a qualified-immunity defense "as early in the lawsuit as possible." *Id.*

To obtain qualified immunity, a defendant must establish that he was acting within his discretionary authority when the alleged violation occurred. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009).  If the defendant satisfies this requirement, the plaintiff must demonstrate that qualified immunity is inappropriate. *Id.*  To determine whether qualified immunity exists, a court

must evaluate (1) whether a plaintiff has alleged a violation of a constitutional right and (2) whether the right at issue was clearly established at the time of the official's conduct. *See, e.g.*, *Randall v. Scott*, 610 F.3d 701, 715 (11th Cir.2010).  Courts may consdier these issues in any order. *Powell v. Sheriff, Fulton Cnty. Ga.*, 511 F. App'x 957, 960 (11th Cir. 2013) (citing *Ashcroft v. al-Kidd*, 563 U.S. ____, 131 S. Ct. 2074 (2011)).  The failure to satisfy either prong requires denial of qualified immunity.

Perry maintains that she was acting within her discretionary authority at the time of the alleged violation because, as the City's Human Resources Director, she was acting in a supervisory fashion in administering the City's drug-testing policy and she was exercising her discretion in determining the employees chosen to be drug-tested pursuant to that policy.  This Court disagrees.

To determine whether an official was performing a discretionary duty, the court must consider two issues: (1) whether the official was performing a legitimate job-related function and (2) whether the official conducted that function through means that were within her power to utilize. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  Although Perry was a supervisor at the time that she ordered that Hudson be drug-tested, and ordering drug testing fell within Perry's job responsibilities, the Amended Complaint asserts that Perry had Hudson drug tested for reasons entirely unrelated to her duties at the City.  If these allegations are true, Perry was not performing a legitimate job-related function when she ordered that Hudson be tested, and it was not within her power to order the testing for personal reasons.

But even if Perry had been acting within her discretionary authority, under the allegations of the Amended Complaint, Perry's actions violated clearly established law.  To determine whether a right was clearly established at the time of the alleged violation, the court must consider "whether

it would be *clear* to a reasonable [city official] that [her] conduct was unlawful in the situation [she] confronted." *Leslie v. Hancock Cnty. Bd. of Educ.* 720 F.3d 1338, 1345 (11th Cir. 2013) (citation and quotation marks omitted) (emphasis in original). This, in turn, requires the court to examine the law as decided by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida. *See id.* (citation omitted). "[T]he salient question . . . is whether the state of the law . . . gave [the official] *fair warning* that [her] alleged treatment of [Hudson] was unconstitutional." *Id.* (citation and quotation marks omitted) (emphasis in original).

A right may be clearly established in three different ways: (1) the case under review shares facts with "materially similar" precedent; (2) a "broader, clearly established principle . . . control[s] the novel facts [of the] situation"; or (3) the conduct "so obviously violate[s] [] th[e] [C]onstitution that prior case law is unnecessary." *Id.* at 1345-46 (citations and quotation marks omitted).

The Supreme Court has repeatedly reiterated that, absent rare and limited circumstances not pertinent here, the Fourth Amendment requires that a search be supported by individualized suspicion. *See, e.g.*, *Chandler*, 520 U.S. at 308 ("[The Fourth Amendment's] restrained on government generally bars officials from undertaking a search or seizure absent individualized suspicion."); *Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) ("A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."); *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 ("[S]ome quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure."). While the Constitution imposes no "irreducible" measure of such suspicion, some level of suspicion is nonetheless required, and the Supreme Court has "recognized only limited circumstances in which the usual rule does not apply." *Edmond*, 531 U.S. at 37. These recognized exceptions are predicated on certain "special needs," in which the

government's interest in undertaking the suspicionless search is particularly high.  *See Skinner*, 489 U.S. at 624 ("In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.").  The Supreme Court has emphasized, however, that such a special need in the context of drug testing must be "substantial" and "sufficiently vital" to overcome the individual's acknowledged privacy interest.  *Chandler*, 520 U.S. at 318.

With respect to drug-testing of public employees, the Supreme Court has authorized random, suspicionless searches only where the nature of the individual's employment implicated public safety.  *See, e.g.*, *Skinner*, 489 U.S. at 602 (railway employees engaged in safety-sensitive tasks); *Von Raab*, 489 U.S. at 656 (customs employees who carry firearms and are concerned with the interdiction of controlled substances).  But where public safety is not "genuinely in jeopardy," the Fourth Amendment precludes suspicionless searches. *Chandler*, 520 U.S. at 323.

According to the Amended Complaint, Perry lacked any suspicion whatsoever to drug-test him and instead did it to exact vengeance on Hudson.  This is in no way related to any public-safety measure or other recognized government interest supporting a suspicionless search.  In the absence of any suspicion at all, such a personal and abusive use of the government's power to conduct drug-testing so obviously violates Fourth Amendment rights that no case law stating this proposition was necessary to have put Perry on notice of its unconstitutionality.  For this reason, the Court denies Perry's qualified-immunity defense at this time.

-24-

### *V.  Conclusion*

For the foregoing reasons, it is hereby **ORDERED** and **ADJUDGED** that  Defendants'

Motion to Dismiss Plaintiff's Second Amended Complaint [ECF No. 78] is hereby **GRANTED** IN

**PART AND DENIED IN PART** as follows:

1.     The Motion to Dismiss is **GRANTED** with respect to Counts I and III of the Second

Amended Complaint as they relate to Defendants City of Riviera Beach and Gloria

Shuttlesworth.

2.     The Motion to Dismiss is **DENIED** with respect to Count II as it pertains to

Plaintiff's Fourth Amendment claim against Defendant Doretha Perry.

**DONE** and **ORDERED** in Fort Lauderdale, Florida, this 9th day of May 2014.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of record

Michael A. Hudson, *pro se*
180 NE 123rd Street
North Miami, FL 33161